[Crim. No. 21460. Nov. 10, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
RONNY WILLIAM MOZINGO, Defendant and Appellant.

[Crim. No. 21872. Nov. 10, 1983.]

In re RONNY WILLIAM MOZINGO on Habeas Corpus:

**COUNSEL**

Marshall W. Krause, under appointment by the Supreme Court, Paul F. Goldsmith and Krause, Timan, Baskin, Shell and Grant for Defendant and Appellant and Petitioner.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Joel E. Carey, Ronald G. Prager and Raymond L. Brosterhous, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**RICHARDSON, J.**—Defendant Ronny William Mozingo appeals from a judgment imposing the death penalty following his conviction of first degree murder (Pen. Code, § 189; further statutory references are to this code unless otherwise indicated) and rape (§ 261). He also seeks a writ of habeas corpus based upon his claim that he was ineffectively represented by his trial counsel. These proceedings have been consolidated for opinion.

To assist this court in resolving the inadequate counsel claim, we appointed the Honorable J. Spurgeon Avakian, Judge of the Superior Court of Alameda County, Retired, as referee to take evidence and make findings regarding that claim. Following the reference hearing, the referee filed his report and findings, concluding that defendant's trial counsel failed to act in the manner expected of a reasonably competent attorney acting as a diligent advocate, thereby depriving defendant of a potentially meritorious defense. (See *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

As will appear, we have concluded that we should adopt the referee's report and that defendant's conviction should be reversed for the reasons set forth therein. Additional contentions raised by defendant in his appeal need not be resolved.

On December 18, 1979, defendant was charged with the rape and murder of his stepmother, Janey Mozingo. The information alleged as special circumstances permitting imposition of the death penalty that the murder was of the first degree and was both (1) especially heinous, atrocious and cruel (§ 190.2, subd. (a)(14)), and (2) committed while defendant was engaged in the commission of rape, or in the immediate flight after committing rape (§ 190.2, subd. (a)(17)). The information also alleged that defendant had in 1977 suffered a prior rape conviction.

On February 19, 1980, trial by jury commenced with defendant represented by private appointed counsel. On March 14, 1980, the jury found defendant guilty of first degree murder and rape; both special circumstances were also found to be true. On March 17, the penalty phase commenced and, on March 18, the jury fixed the penalty at death. The present appeal is automatic. (§ 1239, subd. (b).)

We summarize the factual background underlying defendant's offenses. On September 25, 1979, the nude body of Janey Mozingo was discovered by her son Tommy. Janey had been "hogtied" with electrical cords wrapped around her neck and body in such a manner as to result in her strangulation. Investigating officers found no signs of forced entry into the house; no valuables were missing. Sperm and seminal fluid were found in the victim's vagina, indicating sexual intercourse within approximately 24 hours of death. The victim's husband Duane (defendant's father) testified that he had no intercourse with his wife within 48 hours preceding her death.

Defendant is Duane Mozingo's son by a former marriage. Duane married Janey in 1966, and defendant apparently blamed both Duane and Janey for breaking up his parents' marriage. Defendant, incarcerated at Soledad for a prior offense (identified at the penalty phase as rape), was paroled on August 20, 1979. He went to live with his mother and stepfather and, a few weeks later, moved in with his sister Linda and her husband Kent. Their household was located in Sacramento about three miles from the Mozingo residence where the murder occurred. On September 28, a few days after the crime took place, defendant confessed to his sister that he had killed Janey Mozingo.

According to Linda, defendant made the following statement to her: On the day of the murder, he rode his bicycle to the Mozingo residence where he accosted his victim. She acknowledged his presence and then returned to her bathroom to complete arranging her hair and makeup. Feeling ignored, defendant approached Janey from behind, clamped his hand over her mouth, and told her "I don't like what you did to my family." Janey re-

plied, "I'll do what you want," and defendant thereupon "boned" her (his term for sexual intercourse).

After completing intercourse, defendant ordered his victim to remain on the floor. Defendant found some electrical cords and tied her feet, hands and neck together as she lay on her stomach and arched her back. Defendant, characterizing his deed an "execution," thereupon watched Janey die by self-strangulation. Defendant told his sister that he had seen this method of killing during a television movie which he viewed while at Soledad prison. (The jury was shown an abridged version of this film, "The Brotherhood.") Defendant demonstrated to his sister the way he had tied up Janey.

Linda asked her brother why he had killed his stepmother rather than Duane, his father. Defendant replied that "she just happened to be there," and that he had been thinking of doing "this" for four years while in prison; that he decided to commit the murder when he arose from bed that morning, and that he was not sorry that his stepmother was dead.

On cross-examination, Linda recalled that at the conclusion of defendant's confession she asked him whether "as a Christian" he had told her the truth about the murder. Defendant, evidently recanting his confession to her, replied that "as a Christian, I didn't do it."

The police found no physical evidence or fingerprints to connect defendant with the murder. Witness Ramirez, a neighbor of the Mozingos, testified, however, that on the morning of the slaying he saw defendant ride by on a bicycle, park in the Mozingo driveway, and dismount. An hour or so later, Ramirez noticed that the bicycle was gone.

Linda repeated defendant's confession to her husband, a reserve deputy sheriff. After defendant learned that the police wanted to question him, he fled to Southern California, failing both to report for a job interview at his parole board, and to advise his parole officer of his intent to leave the area. Defendant was later apprehended in an apartment near Sacramento.

At trial, defendant denied that he had either confronted, raped or killed his stepmother. According to defendant, on the day of the killing he rode his bicycle to the Department of Motor Vehicles, to a service station, and to a pool hall before returning to his residence to do some yard work. (His alibi was uncorroborated by any witnesses.) Defendant denied having seen the victim for 11 or 12 years. He further testified that in 1979, he injured his arm while in prison and could not raise it above his head. He admitted viewing "The Brotherhood" while in prison, but denied thinking about killing anyone in the manner depicted in that movie.

According to defendant, after Janey was killed, defendant read accounts of her death in local newspapers. His subsequent confession to his sister was false, invented by him on the basis of these news articles. To explain why his confession included certain details of the killing not previously reported, defendant denied furnishing those details to his sister. He could not explain why his sister would have lied regarding these statements, and he admitted that he continued to maintain a warm and loving relationship with her.

On rebuttal, the People introduced medical testimony indicating that defendant's arm had probably healed substantially by the time of the murder.

At the penalty phase, the prosecutor introduced evidence of other episodes to establish defendant's background, aggressive character and disposition to commit sexual offenses. During one prior incident, defendant had pointed a pellet gun at two men and threatened to shoot them. On another occasion, defendant, brandishing a knife, abducted, raped, and sodomized a 14-year-old girl. As a result of this latter offense, defendant pled guilty to a charge of forcible rape (former § 261, subd. 3), was found to be a mentally disordered sex offender (MDSO), and was committed to Atascadero State Hospital for treatment.

Defendant's mother testified on his behalf regarding the various commitments and placements of defendant during the period from 1968 to 1974. According to his mother, defendant received only minimal care and counseling during his various juvenile court commitments.

Defendant's primary contention is that his trial counsel improperly failed to investigate a possible insanity or diminished capacity defense and to present evidence of defendant's mental state and background as mitigating circumstances at the penalty phase. We summarize the highlights and findings of Judge Avakian's report:

Defendant was born in 1957; his parents divorced in 1964. Thereafter, defendant was "constantly in trouble," and was placed under the custody of juvenile court for the next few years. In 1968, defendant was placed under observation in Napa State Hospital for three months. From that time until the date of the murder, (Sept. 1979) defendant was almost continuously confined in various county and state institutions (spending during this period only approximately 150 days free of confinement). In 1976, defendant pled guilty to the rape at knifepoint of a 14-year-old girl, and was adjudged an MDSO and committed to Atascadero State Hospital. After 15 months, he was rejected as unamenable to MDSO treatment and was committed to state

prison. Approximately one month after being paroled, he committed the present offense.

Before trial in this case, the prosecutor furnished defendant's counsel with the Youth Authority file and MDSO reports regarding petitioner. Although this file contained, according to the referee, "significant material which would alert a reasonably competent attorney to investigate possible mental defenses," counsel declined to do so. Counsel decided that a diminished capacity defense would be inconsistent with petitioner's denial of complicity in the murder. As for a possible insanity defense, defendant refused to enter an insanity plea and specifically instructed counsel that he wanted no psychiatrists to examine him.

Possibly because of defendant's negative attitude toward "mental defenses," his counsel "paid little attention" to the material in the file turned over to him. The file contained a 1973 report by a social worker which indicated that defendant's I.Q. was only 83 at age 10. This report also referred to a psychiatric report which "saw a progression toward becoming schizophrenic, related that Petitioner had recited auditory hallucinations, and expressed the view that Petitioner was undergoing 'possible paranoid personality changes.' His diagnosis was 'Schizophrenic, Chronic, incipient, all in the regressing, repressed, deprived, immature personality.'" Another report indicated that defendant "has fantasized one day destroying another person and committing suicide . . . ."

According to the referee, had defendant's counsel explored the issue by retaining psychiatric experts, he could have developed a potentially meritorious defense of "either episodic insanity or diminished capacity negating first degree murder . . . ." At the habeas corpus hearing, Dr. Neurenberger, a fulltime staff psychiatrist at San Quentin Prison, testified that he had examined defendant during several therapy sessions and opined that defendant had experienced a "dissociative reaction" and partial memory loss during the killing, effects which "erupted from motivations that had long been suppressed and repressed." Dr. Neurenberger further found evidence of diminished capacity at the time of the killing, in that defendant did not have the capacity to form an intent to kill, or to premeditate or deliberate.

According to a report by Dr. Neurenberger, defendant told him that on the day of the killing he rode his bicycle to his father's house, and was invited in by his stepmother who kissed him "full on the mouth." Defendant's next memory is of riding away from the house on his bicycle. Defendant also told Dr. Neurenberger that he had experienced frequent blackouts or memory losses, and had found himself engaging in "cruel conduct" which he was powerless to stop.

Dr. Crinella, a psychologist at Fairview State Hospital, examined and tested defendant and "saw possibilities of (1) incipient paranoid schizophrenia, (2) psychomotor epilepsy, and (3) altered state of consciousness, with a strong likelihood of dissociative reaction." Defendant's version of the events related to the killing were consistent with an "episodic state of dissociative reaction . . . and such a state would fall within the legal definition of insanity . . . and diminished capacity . . . ."

An attorney who was a criminal specialist testified that in his opinion reasonably competent counsel would have engaged a psychiatrist to assist in evaluating the case even if the client objected to a "mental defense," in order to learn what defenses were available and to advise his client accordingly.

The referee, on the basis of the foregoing testimony and evidence, concluded that trial counsel rendered inadequate representation in failing to investigate possible diminished capacity or insanity defenses, to request appointment of a psychiatrist, and to introduce at the penalty phase evidence of defendant's mental condition as a mitigating circumstance. The referee also concluded that counsel's inadequate representation thereby deprived defendant of a potentially meritorious defense or mitigating circumstance.

While agreeing with trial counsel that a diminished capacity defense might have interfered with defendant's denial of complicity in the crime, the referee believed that counsel nonetheless had an obligation initially to investigate the matter and discuss his findings with defendant. ■ Moreover, despite defendant's express refusal to plead a defense of insanity or to cooperate with a psychiatrist, the referee concluded that "by its inherent nature, a mental defense is often beyond the client's understanding," and consequently counsel must attempt to investigate the issue despite his client's objections, and thereafter inform and advise his client accordingly, leaving the ultimate decision to him (see *People* v. *Gauze* (1975) 15 Cal.3d 709, 717 [125 Cal.Rptr. 773, 542 P.2d 1365] [insanity plea personal to defendant]).

The referee also observed that although the prosecutor relied upon defendant's "lifetime career of crime and incarceration" as an aggravating circumstance at the penalty phase, defendant's counsel declined to introduce expert testimony disclosing that defendant's background resulted from mental illness or emotional problems. (See § 190.3, subd. (h).)

In response to the report of the referee, the People rely primarily upon defendant's assertion of an alibi defense and a general denial of guilt. The People correctly observe that a diminished capacity defense could have

weakened or conflicted with defendant's alibi defense. (See, e.g., *People* v. *Miller* (1972) 7 Cal.3d 562, 572-573 [102 Cal.Rptr. 841, 498 P.2d 1089]; *In re Saunders* (1970) 2 Cal.3d 1033, 1048-1049 [88 Cal.Rptr. 633, 472 P.2d 921]; *People* v. *Cram* (1970) 12 Cal.App.3d 37, 46 [90 Cal.Rptr. 393].) ■ Yet as the referee explained, a possible conflict between a diminished capacity and an alibi defense would not excuse counsel's failure initially to *investigate* the potential strengths of a "mental defense" vis-à-vis an uncorroborated alibi defense. (See *People* v. *Frierson* (1979) 25 Cal.3d 142, 162-164 [158 Cal.Rptr. 281, 599 P.2d 587].) As we stated in *Frierson,* "By his inaction, deliberate or otherwise, counsel deprived himself of the reasonable bases upon which to reach *informed* tactical and strategic trial decisions." (P. 163, italics in original.)

The People further argue that trial counsel's failure to investigate possible "mental defenses" was excused by defendant's rejection of such defenses and his refusal to cooperate in developing them. (See, e.g., *People* v. *Haskett* (1982) 30 Cal.3d 841, 852-853 [180 Cal.Rptr. 640, 640 P.2d 776]; *People* v. *Beagle* (1972) 6 Cal.3d 441, 459-460 [99 Cal.Rptr. 313, 492 P.2d 1].) These cases do not suggest, however, that a client's initial opposition should excuse counsel from undertaking sufficient investigation of possible defenses to enable counsel to present an *informed* report and recommendation to his client. Unlike the present case, in both *Haskett* and *Beagle* the evidence available to defense counsel would have failed to support an insanity or diminished capacity defense. Moreover, in both cases the defendant's alibi defense was at least partially corroborated. In the present case, on the other hand, defendant's version of the events was uncorroborated (and, indeed, was contradicted by defendant's confession to his sister), a factor which should have induced defense counsel to investigate carefully all alternative theories of defense.

■ Our standard of review of a referee's report and recommendation in these circumstances is well settled: "A referee's findings of fact are, of course, not binding on this court, and we may reach a different conclusion on an independent examination of the evidence produced at the hearing he conducts even where the evidence is conflicting. [Citation.] However, where the findings are supported by 'ample, credible evidence' [citation] or 'substantial evidence' [citation] they are entitled to great weight [citations] because of the referee's 'opportunity to observe the demeanor of the witnesses and weigh their statements in connection with their manner on the stand . . . .' [citation]." (*In re Branch* (1969) 70 Cal.2d 200, 203, fn. 1 [74 Cal.Rptr. 238, 449 P.2d 174]; accord *In re Hall* (1981) 30 Cal.3d 408, 416 [179 Cal.Rptr. 223, 637 P.2d 690].)

■ Having reviewed the record we conclude that substantial evidence supports the referee's findings. and that we should adopt his findings and conclusions as our own.

The judgment in Crim. 21460 is reversed, and the writ of habeas corpus in Crim. 21872 is granted. Defendant is remanded to the custody of the Sacramento County Superior Court for further proceedings consistent with this opinion.

Bird, C. J., Mosk, J., Kaus, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.