[Crim. No. 21630. Sept. 19, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
LAVELL FRIERSON, Defendant and Appellant.

804

**COUNSEL**

David A. Elden for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Daniel J. Kremer, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., and Susanne C. Wylie, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KAUS, J.**—Defendant Lavell Frierson appeals from a judgment imposing the death penalty following his conviction of first degree murder with special circumstances and other offenses. In *People* v. *Frierson* (1979) 25 Cal.3d 142 [158 Cal.Rptr. 281, 599 P.2d 587] (*Frierson I*), we reversed defendant's conviction of these same offenses at an earlier trial on the ground that defense counsel at that trial had provided constitutionally inadequate representation by failing properly to investigate or present a diminished capacity defense. On remand, defendant requested his new appointed counsel to present evidence of his diminished capacity as a defense at the guilt/special circumstances phase of the trial, but counsel declined to do so, apparently believing that it was wiser to withhold such evidence until the penalty phase. When the conflict between defendant and his attorney was brought to the trial court's attention, the court ruled that the decision whether to present a defense was for counsel, not defendant, to make. On this appeal, defendant claims, inter alia, that the court erred in concluding that defense counsel had the authority to refuse, over defendant's express objection, to present any defense to the charged special circumstances. We conclude that, under the facts of this case, the claim is well-founded and requires reversal of the special circumstance findings and penalty judgment. At the same time, we affirm defendant's convictions of first degree murder and the other substantive offenses and enhancements.

I

The prosecution's case-in-chief at the retrial revealed the same basic facts that were disclosed at the initial trial and were summarized in *Frierson I.* We review them briefly.

On January 3, 1978, Edgardo Kramer and Guillermo Bulnes, two Peruvian airline employees and the ultimate victims in this matter, drove to the Holly Aire Motel in Inglewood to visit a woman named Chris. Bulnes knocked on the door to room 18 and told the young woman who responded—later identified as Zondre Wooley—that he was looking for Chris. Wooley said that Chris was not there, offered Bulnes a "date" for $100, and, when he declined, said that she would call Chris for him.

While Wooley walked to a nearby telephone booth, Bulnes parked his car across the street from the motel driveway. He and Kramer then went to the phone booth and Wooley told them that Chris would arrive shortly. They thanked her and returned to their car.

Soon thereafter, defendant approached the car and asked if they were waiting for Chris. When Bulnes said that they were, defendant drew a gun from his pocket, pointed it at Bulnes and cocked the hammer. He then entered the back seat of the car behind the two men, and ordered Bulnes to lock the door, start the car and begin driving in the direction indicated by defendant.

During the ride, defendant demanded and obtained the victims' wallets and watches. Although defendant told Bulnes not to look at him, Bulnes repeatedly turned and glanced at defendant's face. After traveling a few blocks to a somewhat less populated area, defendant ordered Bulnes to park the car. He then shot both Bulnes and Kramer in the backs of their heads. Although Kramer apparently died instantly, the bullet directed at Bulnes did not penetrate his skull and he was able to grapple with defendant and disarm him. Bulnes pointed the gun at defendant and left the car.

After running a few steps, however, Bulnes fell to the ground. Defendant then grabbed him around the neck and tried to retrieve the weapon. During the ensuing struggle, Bulnes emptied the gun's chamber by firing shots into the ground and threw the gun away. When defendant released his grip on Bulnes, Bulnes ran to a nearby street, flagged down a passing motorist, and was driven to a hospital. As Bulnes entered the car, he saw defendant walking in the general direction of the Holly Aire Motel.

At the hospital, Bulnes reported the events to the police. A few hours later, defendant and Wooley were arrested in room 18 at the Holly Aire

Motel. Distinctive watches owned by the victims, along with other incriminating evidence, were found in the motel room.

Thereafter, defendant and Wooley were charged with murder (Pen. Code, § 187),[1] robbery (§ 211), kidnaping for purposes of robbery (§ 209), and assault with a deadly weapon (§ 245, subd. (a)). The amended information also alleged that the offenses were aggravated by firearm use (§§ 12022.5, 1203.06, subd. (a)(1)) and great bodily injury (§ 12022.7). Finally, the information charged defendant with two special circumstances under the applicable 1977 death penalty law, alleging that the murder was wilful, deliberate and premeditated and was physically committed by defendant during the course of a robbery and a kidnaping. (Former § 190.2, subds. (c)(3)(i), (c)(3)(ii).)

At the retrial, Bulnes, who was seriously injured but survived the shooting, gave the foregoing account of the incident and positively identified defendant as the assailant. The investigating police officers testified to the circumstances of the arrest and the discovery of incriminating evidence—including the victims' distinctive watches and defendant's bloody clothing—in the motel room. Finally, an inmate who had been at the county jail when defendant was initially apprehended testified that defendant had recounted the entire crime to him, admitting that he had robbed and shot the two victims.

After the prosecution had completed its case-in-chief, defense counsel rested without calling any witnesses or presenting any defense. Immediately thereafter, a discussion was held, outside the presence of the jury, in which the conflict between defendant and defense counsel as to whether any defense should be presented on defendant's behalf was explicitly brought to the court's attention. We describe that discussion, as well as the events leading up to it and an additional in-chambers conference held shortly thereafter, in some detail below. After considering the conflict, the trial court ruled that the decision whether to present a defense was for counsel, not defendant, to make. Accordingly, the case went to the jury without any evidence having been presented by the defense.

The jury returned a verdict finding defendant guilty of all the charged offenses and enhancements and also finding true the two charged special circumstances.

At the penalty phase, the prosecution presented evidence of other criminal conduct that defendant had committed in the past, including two armed robberies and a shooting in which the victim was killed.

---

[1]*Unless otherwise noted, all section references are to the Penal Code.*

The defense called a number of witnesses whose testimony suggested that at the time defendant shot Kramer and Bulnes, his mental state had been affected by his use of the drug phencyclidine, more commonly known as PCP or "angel dust." Several lay witnesses, friends of defendant, testified (1) to his long-term use of a variety of drugs, including PCP, (2) to his use of PCP, as well as alcohol, on the day of the offense, and (3) to his intoxicated state shortly before the crime. Two expert witnesses, who had had considerable experience working with users of PCP, also testified on defendant's behalf. Dr. Marvin Gillick, a forensic psychiatrist, testified that in his opinion defendant had a "mental abnormality brought about by voluntary intoxication" of PCP, and that, at the time of the incident, although defendant had the mental capacity to form the specific intent to rob and kidnap the victims, his mental abnormality "substantially impaired [his] capacity to form and harbor the criminal intents necessary for first degree murder," i.e., deliberation and premeditation. Dr. Ronald Siegal, a psychopharmacologist and psychologist, also testified that defendant "was severely intoxicated with PCP [at the time of the offense] as a result of both an acute ingestion on that day as well as chronic use over a long period of time." In rebuttal, both Bulnes and the police officer who arrested defendant testified that from their observations they did not believe that defendant was suffering from any drug-induced intoxication at the time of the crimes.

In his closing argument at the penalty phase, the prosecutor—in discussing the diminished capacity evidence presented by the defense—pointed out that that evidence, relating to the defendant's ability to premeditate and deliberate, actually concerned matters that had been at issue at the guilt/special circumstance phase of the case. He told the jury: "It's very interesting that the defense should offer evidence bearing on the defendant's mental state in regards to premeditation and deliberation at this phase of the trial. Now premeditation and deliberation was an important element in the guilt phase. If the defendant had not been found guilty of premeditating and deliberating, then we wouldn't be facing this phase of the trial. Now, why wasn't it offered at the first phase of the trial? Well, I submit to you there's a very reasonable explanation of that. I submit to you that it's a matter of clever trial tactics and probably something [defense counsel] had to do because he knew that evidence wasn't going to convince anybody at the guilt phase. He knew that no one was going to buy the skimpy evidence, the ambiguous evidence that was offered in this particular phase of the hearings, and that once that guilty phase was over, and those theories were not—didn't carry the day for him, that he could not use them at the penalty phase and they would have no impact. But the hope is now that this type of evidence will influence someone among you who might feel faint about imposition of the death penalty, that will hold onto that as some kind of hook."

After a day of deliberation, the jury returned a verdict sentencing defendant to death. The trial court denied defendant's motion for a new trial. The case is now before us on automatic appeal.

## II

The prosecution's evidence at the guilt phase clearly established that defendant was guilty of first degree murder—under the felony-murder rule—as well as robbery, kidnaping and assault with a deadly weapon. Defendant does not challenge his conviction of those offenses. He maintains, however, that the trial court erred in concluding that his trial counsel had the authority, in the face of defendant's express demand, to refuse to present any defense to the special circumstance charges and instead to withhold evidence supporting such a defense until the penalty phase. To place the claim in perspective, it is necessary to consider a number of additional facts and circumstances disclosed by the record.

As already noted, in *Frierson I*—decided in August 1979—we reversed defendant's initial conviction on the ground that defense counsel at the first trial had provided incompetent representation in failing properly to investigate, prepare and present a diminished capacity defense. In that trial, counsel had made an attempt to raise the diminished capacity issue at the guilt/special circumstance phase by presenting a few lay witnesses who testified in general terms to defendant's drug use, but had failed to consult any expert witnesses who might have aided in presenting a viable defense. In emphasizing the seriousness of trial counsel's failure, we noted that "the defense of diminished capacity was certainly *crucial,* for it represented defendant's *sole* defense to the serious, indeed ultimate, crimes with which he was charged." (Orig. italics.) (*Frierson I, supra,* 25 Cal.3d 142, 163.)

When the case was remanded to the trial court after the reversal, a new attorney, Martin Blake, was appointed to represent defendant on retrial. On January 9, 1980, during a pretrial conference, Blake told the court that another attorney may have solicited defendant's representation the previous month, causing some delay in Blake's trial preparation. Defendant confirmed that he had been contacted by another attorney, but told the court that he retained good relations with Blake. The court advised defendant to inform it if he became dissatisfied with Blake.

Two months later, on March 7, 1980, defendant personally filed a motion requesting the appointment of a second attorney to assist Blake; the court permitted Blake to withdraw the motion. On March 28, 1980, defendant wrote a letter to the court, stating that he had a serious conflict with Blake and wanted a new attorney. Defendant explained that at the outset of his

representation Blake had said that his defense would be diminished capacity, but that when he had spoken to Blake that day "the understanding that I got was that I really don't have a defense." Defendant complained that Blake had not properly investigated the diminished capacity defense and requested the court to appoint a new attorney of defendant's choice.

On April 10, 1980, the court held a hearing on defendant's motion to substitute counsel. Blake filed a declaration at the outset of the hearing confirming that there had been a breakdown in the relationship, but attributing the breakdown to what he felt was the continued interference of another attorney. He told the court that he was not ready to go to trial on the scheduled April 14 trial date and that if the court decided to appoint a second attorney he would be willing to work either as primary or supporting counsel.

In response to the court's inquiry as to which attorney "of choice" defendant had in mind, defendant named a specific attorney, whom defendant had never met but who he had heard was a "pretty good attorney" who handled only murder cases and took appointments. The trial court denied the request to appoint the named attorney in place of Blake, and indicated that he did not think defendant's claim of conflict was sufficient to warrant substitution of new counsel.

Blake, however, was still unsure that he could overcome the breakdown in relations with defendant and asked for a few minutes to discuss the matter with him. After that discussion, Blake informed the court that defendant had decided that he wanted Blake to continue to represent him. At the same time, Blake stated: "I will also represent to the court that I want to make a little more detailed inquiry into this—initial inquiry into this by use of the experts *so that we can have a really true representation to the court that Mr. Frierson wishes to continue with me.* [¶] That won't be necessary to have a return on that, that will just be my problem." (Italics added.) The court then asked defendant whether he was agreeing to have Blake continue, and defendant said "Yes."

The record reveals nothing further about the attorney-client conflict until Blake indicated, at the conclusion of the People's case at trial, that the defense was resting without putting on any evidence. Immediately thereafter, at Blake's request, an in-chambers conference was held. Blake stated: "After my investigation and my consultation with the doctors and Mr. Frierson, my opinion was that there should not be a defense presented, especially the defense of diminished capacity as to the guilt phase. Mr. Frierson strongly disagrees with that position. He's advised me several times he wishes to present that defense. I took the precaution of advising

the court informally a couple of days ago about this problem. And that's where it stands. We've discussed—Mr. Frierson and myself—have discussed this up until probably 20 minutes ago. And he's still of a strong, very strong position—state of mind that he would like to present a diminished capacity defense."

The trial court confirmed that Blake had brought the problem to its attention some time earlier, but explained that it had not wished to get into specific details at that time for fear of infringing the defendant's privilege against self-incrimination. The court then ruled that under its understanding of the law, "the final judgment and decision has to be that of the attorney as to how to proceed in a case." Accordingly, it concluded that defense counsel had the authority to decline to present a defense, despite defendant's contrary wishes.

The next day, after closing arguments had been presented and the case had been submitted to the jury, Blake informed the court that defendant wished to make a statement. Another in-chambers conference was convened and Frierson stated: "Well, I been housed in the county jail for about eight months. And I seen Mr. Blake on different occasions. And he was telling me I was going to present a defense all along. Then until yesterday, I didn't know that we wasn't going to put a defense. He told me that he was going to call a psychiatrist. He said he was going to have the psychiatrists testify, but he was going to call witnesses. But the witnesses got the subpoenas yesterday. And you know this surprised me when he just rested the case after the district attorney did. And I wanted a defense. I feel that I had a right to present a defense. And I feel that Mr. Blake didn't want to put a defense up for me. And [he] should have told you, the judge, and disqualified or get hisself off the case, you know. And I feel that the court was wrong for denying me a defense."

The court rejected the claim that it had denied defendant a defense, and reiterated its view that his counsel "was in control of the lawsuit."

From this review of the record, it is evident that from the outset of his representation by Blake, defendant made it clear that he wanted to present a diminished capacity defense at the guilt/special circumstance phase. It is also clear that there was at least some evidence—of which counsel was aware—to support such a defense. As noted, at the penalty phase counsel presented not only a number of lay witnesses who testified to defendant's long-term drug usage and his use of PCP on the day of the offense, but also two expert witnesses who testified to defendant's history of drug abuse and to the effects of chronic use of PCP on an abuser's behavior. In addition, one of the experts specifically concluded that defendant's PCP use had sub-

stantially impaired his capacity to form and harbor the criminal state of mind—premeditation and deliberation—necessary for a finding of special circumstances under the applicable 1977 death penalty law.

The principal issue presented is whether a defense counsel's traditional power to control the conduct of a case includes the authority to withhold the presentation of any defense at the guilt/special circumstance stage of a capital case, in the face of a defendant's openly expressed desire to present a defense at that stage and despite the existence of some credible evidence to support the defense. As defendant accurately points out, this issue is quite distinct from the question whether trial counsel provided competent representation in choosing to withhold the evidence until the penalty phase of the trial. Although defendant also maintains in a separate argument that trial counsel was not competent in following that course of action, in analyzing the present contention we may assume that counsel's decision to withhold the evidence from the guilt/special circumstance phase fell within the range of conduct that competent defense counsel might reasonably employ. Defendant's claim is that even if that is so, the decision whether to present any defense at all at the guilt/special circumstance phase of a capital case is so fundamental, and has such serious consequences for a defendant, that it is one that cannot properly be taken from him by his counsel. In support of this contention, defendant relies on a series of cases—decided by the United States Supreme Court as well as by this court—which have recognized that, with respect to certain fundamental decisions in the course of a criminal action, a counsel's control over the proceedings must give way to the defendant's wishes.

In *Brookhart* v. *Janis* (1966) 384 U.S. 1 [16 L.Ed.2d 314, 86 S.Ct. 1245], one of the early federal decisions in this line, defense counsel, over the defendant's apparent objection, agreed that the criminal proceeding would be conducted as a "prima facie trial," in which the prosecution was required only to present a prima facie showing of guilt and the defense would neither present evidence on defendant's behalf nor cross-examine the prosecution witnesses. Concluding that such a "prima facie" proceeding was "the practical equivalent of a plea of guilty" (384 U.S. at p. 7 [16 L.Ed.2d at p. 319]), the *Brookhart* court emphatically rejected the contention "that counsel for defendant can override his client's desire expressed in open court to plead not guilty, and enter in the name of his client another plea—whatever the label—which would shut off the defendant's constitutional right to confront and cross-examine the witnesses against him which he would have had an opportunity to do under a plea of not guilty." (*Id.,* at pp. 7-8 [16 L.Ed.2d at p. 319].) Accordingly, the court reversed the defendant's conviction. (See also *People* v. *Wheeler* (1968) 260 Cal.App.2d 522 [67 Cal.Rptr. 246].)

In *People* v. *Robles* (1970) 2 Cal.3d 205 [85 Cal.Rptr. 166, 466 P.2d 710], we recognized another fundamental decision over which the defendant, rather than his counsel, must properly have ultimate control. In *Robles*, a capital case, the defendant had insisted, over his attorneys' objection, on testifying in his own behalf; on appeal, appellate counsel claimed that the trial court had erred in permitting such testimony on the ground that the decision whether to call defendant as a witness was a tactical decision within the province of trial counsel's authority. In rejecting that contention, we explained: "Although . . . an attorney representing a criminal defendant has the power to control the court proceedings [citations], that power may not be exercised to deprive a defendant of certain fundamental rights [citations]. [¶] We are satisfied that the right to testify in one's own behalf is of such fundamental importance that a defendant who timely demands to take the stand contrary to the advice given by his counsel has the right to give an exposition of his defense before a jury. [Citation.] The defendant's insistence upon testifying may in the final analysis be harmful to his case, but the right is of such fundamental importance that every defendant should have it in a criminal case. Although normally the decision whether a defendant should testify is within the competence of the trial attorney [citation], where, as here, a defendant insists that he wants to testify, he cannot be deprived of that opportunity." (2 Cal.3d at pp. 214-215.)

The Attorney General, noting that the facts here do not fall directly within the parameters of *Brookhart, Robles,* or any of the other decisions which have identified specific rights as within a defendant's, rather than counsel's, ultimate control (see, e.g., *People* v. *Holmes* (1960) 54 Cal.2d 442 [5 Cal.Rptr. 871, 353 P.2d 583] [right to jury trial]; *Townsend* v. *Superior Court* (1975) 15 Cal.3d 774, 781 [126 Cal.Rptr. 251, 543 P.2d 619] [right to speedy trial]; *People* v. *Gauze* (1975) 15 Cal.3d 709, 717 [125 Cal.Rptr. 773, 542 P.2d 1365] [right of competent defendant to refuse to enter insanity plea]), suggests that this case is analogous to the many decisions which have upheld an attorney's control over matters of ordinary trial strategy, such as whether a particular witness should be called (see, e.g., *People* v. *Beagle* (1972) 6 Cal.3d 441, 458 [99 Cal.Rptr. 313, 492 P.2d 1]), whether certain evidence should be introduced (see, e.g., *People* v. *Murphy* (1972) 8 Cal.3d 349, 366-367 [105 Cal.Rptr. 138, 503 P.2d 594]), whether an evidentiary objection should be interposed (*People* v. *Lamphear* (1980) 26 Cal.3d 814, 828 [163 Cal.Rptr. 601, 608 P.2d 689]), or whether a particular trial judge should be challenged. (*People* v. *Jackson* (1960) 186 Cal.App.2d 307 [8 Cal.Rptr. 849].) In this regard, the Attorney General stresses that defense counsel's decision to withhold any evidence of diminished capacity until the penalty phase was quite clearly based on counsel's assessment of the best trial tactics to pursue.

Although we have little doubt that trial counsel's actions reflected his judgment as to the most promising trial strategy, the relevant precedents demonstrate that that factor alone does not defeat defendant's claim. The decision whether or not a defendant should take the stand is often steeped in tactical considerations, yet *Robles* clearly establishes that counsel cannot override a defendant's decision to testify in his own behalf. Similarly, the decision whether to plead guilty to a lesser offense also frequently reflects strategic concerns, but a defendant nonetheless retains personal control over such a plea. (See, e.g., *People* v. *Rogers* (1961) 56 Cal.2d 301, 305 [14 Cal.Rptr. 660, 363 P.2d 892].) Thus, although it is sometimes stated, as a rule of thumb, that matters of trial strategy and tactics rest exclusively within the discretion of counsel, the fact that the trial attorney's action in this case was motivated by strategic considerations does not foreclose inquiry into whether the decision in question here was "of such fundamental importance" (*Robles, supra,* 2 Cal.3d at p. 215) that defendant's wishes should have been respected.

Several considerations lead us to conclude that this case is qualitatively different from the bulk of decisions which have properly confirmed counsel's broad control over "trial tactics," and is instead analogous to those cases which have recognized the need to respect the defendant's personal choice on the most "fundamental" decisions in a criminal case.

To begin with, as we recognized in *Frierson I* (25 Cal.3d at p. 163), the diminished capacity defense which defendant wanted his counsel to present was defendant's *sole* defense to the special circumstance allegations. Although defense counsel cross-examined the prosecution witnesses and urged the jury in closing argument to return only a second degree murder conviction, the uncontradicted evidence before it virtually compelled a first degree felony-murder conviction. Furthermore, while the special circumstance charges required the People to prove the additional elements of premeditation and deliberation, in the absence of any defense evidence relating to defendant's state of mind the jury was left without any evidentiary basis or legal theory to reject the special circumstances.[2] Thus, while defense counsel never expressly conceded the case at the guilt/special circumstance stage, his decision not to present any defense at that stage virtually assured that the jury would find in favor of the prosecution on all issues.

Of course, trial counsel may well have had sound reasons to believe that defendant's best chance of escaping the death penalty was to forego any attempt at defending the special circumstance allegations, since, if the de-

---

[2]Because no evidence of diminished capacity had been introduced, the jury was not instructed on that doctrine.

fense had not succeeded, the evidence of diminished capacity—having failed to impress the jury once—might well have had less potency at the penalty phase. As a practical matter, however, the adoption of counsel's strategy guaranteed that, at a minimum, defendant would face a sentence of life imprisonment without possibility of parole. Although counsel may have felt that it was wisest to attempt to avoid the death penalty at all costs, defendant—whose fate was on the line—evidently had a different perspective, perhaps because he felt that a sentence of life without possibility of parole was not much preferable to a death sentence. Thus, defendant steadfastly maintained that he wanted to present a defense to the special circumstance charges, preserving his only hope of avoiding life imprisonment without possibility of parole.

Given the magnitude of the consequences that flowed from the decision whether or not to present any defense at the guilt/special circumstance phase, we do not think counsel could properly refuse to honor defendant's clearly expressed desire to present a defense at that stage.[3] Just as a defendant in an ordinary criminal case retains the right to refuse to plead guilty to a lesser offense even if his counsel is convinced that such a plea will lead to a lesser penalty, a defendant in a capital trial must also retain the right to have his only viable defense to the guilt or special circumstance charges presented at the initial stage of the trial.[4] To paraphrase *Robles,* "[a]lthough

---

[3]As noted, the record of the penalty phase proceedings demonstrates that in this case there was evidence to support the diminished capacity defense defendant wished to present. Although we have assumed for purposes of analysis that defense counsel was not incompetent in determining to withhold the diminished capacity evidence until the penalty phase, we think that it is at least equally clear that counsel's conduct would have fallen within the range of competent representation if he had chosen to present the diminished capacity evidence as a defense to the special circumstance allegations. Accordingly, we have no occasion in this case to determine whether a defendant has a constitutional right to insist on the presentation of a defense which has no credible evidentiary support or on which no competent counsel would rely.

[4]In *Faretta* v. *California* (1975) 422 U.S. 806, 819-820 [45 L.Ed.2d 562, 572-573, 95 S.Ct. 2525], the United States Supreme Court, in discussing the nature of the rights guaranteed by the Sixth Amendment of the federal Constitution, explained: "The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be 'informed of the nature and cause of the accusation,' who must be 'confronted with the witnesses against him,' and who must be accorded 'compulsory process for obtaining witnesses in his favor.' . . . The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails. [¶] The counsel provision supplements this design. It speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant. The language and the spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally."

The *Faretta* court also noted that "[i]t is true that when a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy *in many areas. Cf.* . . . *Brookhart* v. *Janis, 384*

the defendant's insistence [on the presentation of a defense at the guilt/ special circumstance stage] may in the final analysis be harmful to his case . . . the right is of such importance that every defendant should have it . . . ." (2 Cal.3d at p. 215.)[5]

 We recognize, of course, that a defendant's right to insist that a defense be presented at the initial phase of the trial will inevitably impinge on defense counsel's handling of the case. Such impingement on defense counsel's actions, however, results any time a defendant chooses to exercise a personal right—such as the right to testify or the right to trial by jury— over counsel's contrary advice. Numerous decisions explain that, in such a

---

*U.S. 1, 7-8* . . . . This allocation can only be justified, however, by the defendant's consent, at the outset, to accept counsel as his representative. . . . Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not *his* defense." (First italics added.) (422 U.S. at pp. 820-821 [45 L.Ed.2d at pp. 573-574].)

Indeed, even the dissenting judges in *Faretta* made clear that defense counsel does not enjoy an unlimited discretion—in the exercise of "trial strategy"—to override a defendant's wishes on matters of fundamental importance. Justice Blackmun, in a dissent joined by Chief Justice Burger and Justice Rehnquist, emphasized that *Faretta* itself was "not a case where defense counsel, against the wishes of the defendant or with inadequate consultation, has adopted a trial strategy that significantly affects one of the accused's constitutional rights. *For such overbearing conduct by counsel, there is a remedy. Brookhart v. Janis, 384 U.S. 1 (1966)* . . . ." (Italics added.) (422 U.S. at p. 848 [45 L.Ed.2d at p. 589].)

[5]Although the relevant provision of the American Bar Association (ABA) Standards for Criminal Justice—standard 4-5.2—does not address the precise issue involved in this case, the commentary to that standard appears, at least by implication, to support the above conclusion. After recognizing that the defendant should have the ultimate say on (1) what plea to enter, (2) whether to waive jury trial, and (3) whether to testify on his own behalf, the commentary observes: "It is also important in a jury trial for the defense lawyer to consult fully with the accused about any lesser included offenses the trial court may be willing to submit to the jury. Indeed, because this decision is so important as well as so similar to the defendant's decision about the charges to which to plead, the defendant should be the one to decide whether to seek submission to the jury of lesser included offenses. For instance, in a murder prosecution, the defendant, rather than the defense attorney, should determine whether the court should be asked to submit to the jury the lesser included offense of manslaughter." (1 ABA Standards for Criminal Justice (2d ed. 1980) p. 4.68.) If a defendant in a noncapital case should be the one to decide whether to have a lesser offense submitted to the jury, it appears a fortiori that a defendant in a capital case should have the right to insist that counsel present the only defense that would permit the jury to find him guilty of a lesser, noncapital offense. (See Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases* (1983) 58 N.Y.U.L.Rev. 299, 333 & fn. 137 ["[C]ounsel has an obligation to thoroughly investigate and assess both guilt and penalty phase evidence, to inform his client fully of the trial implications, and to obtain the client's assent to the respective guilt and penalty phase cases to be presented."].)

Indeed, even when measured by the standards applicable to civil cases, defendant's contention appears to have merit. In *Linsk v. Linsk* (1969) 70 Cal.2d 272, 278 [74 Cal.Rptr. 544, 449 P.2d 760], we noted: "If counsel merely employs his best discretion in protecting his client's rights and achieving his client's fundamental goals, his authority to proceed in any appropriate manner has been unquestioned. On the other hand, if counsel abdicates a substantial right of the client contrary to express instructions, he exceeds his authority." It would be difficult to deny that the right to present a defense to a special circumstance allegation is "a substantial right" of the defendant.

situation, the attorney's obligation is simply to provide the best representation that he can *under the circumstances.* (See, e.g., *Robles, supra,* 2 Cal.3d at p. 215; *People* v. *McKenzie* (1983) 34 Cal.3d 616, 631 [194 Cal.Rptr. 462, 668 P.2d 769].)[6] Further, the authorities also establish that when a defendant insists on a course of action despite his counsel's contrary warning and advice, he may not later complain that his counsel provided ineffective assistance by complying with his wishes. (See, e.g., *People* v. *Haskett* (1982) 30 Cal.3d 841, 852-853 [180 Cal.Rptr. 640, 640 P.2d 776]; *People* v. *Gauze, supra,* 15 Cal.3d 709, 718; *Faretta* v. *California, supra,* 422 U.S. 806, 834-835, fn. 46 [45 L.Ed.2d 562, 581]; cf. *People* v. *Mozingo* (1983) 34 Cal.3d 926, 934 [196 Cal.Rptr. 212, 671 P.2d 363] [defendant's hostility to presentation of "mental defenses" did not relieve counsel of obligation *to investigate* such defenses so as to enable him to make an informed recommendation to defendant].)[7]

 In light of the above conclusion, it is clear that in this case both defense counsel and the trial court misjudged the scope of the attorney's authority to override defendant's express wishes on a matter of fundamental

---

[6]As the court explained in *Robles:* "Requiring an attorney against his better judgment to examine his client places no unfair burden on the attorney; an attorney is always faced with the burden of developing his trial strategy in the light of what evidence is available and presented in court. Nor is a defendant ordinarily prejudiced when he is represented by an attorney who believes, contrary to the defendant, that the latter should not testify. On the other hand, in a few cases the disagreement as to whether a defendant should testify may signal a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel." (At p. 215.)

In the present case, there is no indication that defense counsel could not have provided effective representation had he realized that—although it was against his better judgment— the diminished capacity defense should have been presented at the guilt/special circumstance stage, as defendant insisted. Counsel had investigated the defense and shortly thereafter did present the relevant witnesses in the penalty phase of the trial. (See fn. 3, *ante.*)

Thus, this case does not raise the difficult questions that are posed when an attorney—for ethical reasons—determines he cannot properly present the defense that the defendant desires to present. That might be the case, for example, when counsel has reason to believe that defendant's alibi witnesses intend to give perjured testimony. No such problem was present here.

[7]Our conclusion that defense counsel may not override defendant's decision to present a defense at the guilt/special circumstance phase is not in any way inconsistent with this court's decision in *People* v. *Chadd* (1981) 28 Cal.3d 739 [170 Cal.Rptr. 798, 621 P.2d 837] in which we held that, by virtue of a specific statutory provision (Pen. Code, § 1018), a plea of guilty to a capital offense requires the concurrence of both the defendant and his counsel. The statutory provision at issue in *Chadd* reflected a determination by the state that a particular procedural guarantee—the right to require the People to prove a defendant's guilt of a capital offense beyond a reasonable doubt at a fair and public trial—is so basic that it must be afforded unless *both* defendant *and* counsel agree that it should be waived. Nothing in *Chadd* suggests that defense counsel has the right unilaterally to waive—over the defendant's express objection—a right as fundamental as the right to present a defense to charges that carry a minimum penalty of life imprisonment without possibility of parole.

importance.[8] As a consequence, defendant was deprived of the opportunity to present his only viable defense to the special circumstance allegations. Under these circumstances, the special circumstance findings and the subsequent penalty judgment must be reversed and the case remanded for further proceedings. Since defendant makes no claim that the evidence of diminished capacity which was withheld until the penalty phase could possibly have affected any matter other than the special circumstance findings, defendant's convictions of first degree murder, assault with a deadly weapon, robbery and kidnaping, together with the accompanying enhancements, may stand.

The special circumstance findings and the penalty judgment are reversed. In all other respects, the judgment is affirmed.

Broussard, J., and Reynoso, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in affirming the judgment of guilt but dissent from reversal of the special circumstance findings and the penalty judgment.

As a court member who heard the original *Frierson* appeal (*People* v. *Frierson* (1979) 25 Cal.3d 142 [158 Cal.Rptr. 281, 599 P.2d 587]) I get an uneasy feeling of *déjà vu*. At that time the primary issue was the failure of counsel to present evidence of defendant's diminished capacity. Six years later we have before us the same Frierson on a second appeal after retrial, and a similar claim regarding diminished capacity.

However, there is a significant distinction between the two proceedings. In *Frierson I* counsel failed to develop or offer any evidence of diminished capacity, even though Justice Richardson, writing for the plurality, observed that "diminished capacity appears to be the *sole* potentially meritorious defense" (*id.*, at p. 164, italics in original). In the retrial, counsel did obtain expert testimony on this question for presentation to the jury. The issue, therefore, was not *whether* diminished capacity evidence was to be offered, but *when,* i.e., at what point in the trial.

---

[8]We emphasize that our holding rests on the fact that the record in this case *expressly* reflects a conflict between defendant and counsel over whether a defense was to be presented at the guilt/special circumstance stage. Because an attorney's authority to control the trial proceedings generally includes the power to decide when and if particular evidence should be introduced, there would ordinarily be no reason—in the absence of an explicit indication of a conflict—for a trial court to inquire into the defendant's concurrence with his attorney's actions. Thus, nothing in this opinion is intended to suggest that—in the absence of such an express conflict—a court is required to obtain an on-the-record, personal waiver from the defendant whenever defense counsel chooses to rest without putting on a defense. (Cf. *Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709]; *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449].)

I can understand that a total failure to present a potentially meritorious defense is ground to impugn the competency of counsel and to reverse a conviction, as in *Frierson I*. However, when the issue is simply the timing of that presentation, I do not believe we should second-guess counsel's trial strategy, even when it conflicts with the views of the defendant.

Here counsel determined the better strategy was to save his diminished capacity evidence for the penalty phase. He chose this course knowingly and deliberately, even to the extent of permitting his reluctant client to discuss the matter with the trial judge. If he had achieved a verdict other than death, counsel would have been a hero. That he did not ultimately prevail in his tactic does not justify a reviewing court in declaring it improper.

We have held on many occasions that although counsel may not withdraw a valid defense, he may conduct the strategy of the defense in accord with his best professional judgment and without being subjected to review "with the clarity of hindsight." (*People* v. *Fain* (1969) 70 Cal.2d 588, 600 [75 Cal.Rptr. 633, 451 P.2d 65]; see also *People* v. *Murphy* (1972) 8 Cal.3d 349, 365-367 [105 Cal.Rptr. 138, 503 P.2d 594]; *People* v. *Williams* (1970) 2 Cal.3d 894, 905 [88 Cal.Rptr. 208, 471 P.2d 1008]; *People* v. *Hill* (1967) 67 Cal.2d 105, 114-115 [60 Cal.Rptr. 234, 429 P.2d 586].) The circumstances of *People* v. *Reeves* (1966) 64 Cal.2d 766 [51 Cal.Rptr. 691, 415 P.2d 35], are similar to the present case. There, "In the face of strong prosecution evidence in the form of the surviving eyewitness' testimony that defendant without provocation shot down from behind a robbery victim from whom he had taken a mere 70 cents, it was not unreasonable for defendant and his counsel to choose, as they inferably did, to admit the facts and throw defendant on the mercy of the court. The fact that the strategy was unsuccessful on this occasion, of course, is no ground for concluding that the counsel who conceived it was incompetent." (Fn. omitted, *id.* at p. 773.) In the matter before us, counsel in the face of a surviving eyewitness' testimony and overwhelming proof of defendant's guilt, did more than plead for mercy: in the penalty phase he introduced evidence of diminished capacity. That upon reflection, and with the benefit of knowing the ultimate result, he might have been persuaded to present such evidence at an earlier phase of the trial—and that defendant would have preferred to do so—does not justify inferentially rebuking this attorney for an improper defense.

In this respect *People* v. *Ramos* (1982) 30 Cal.3d 553, 584-585 [180 Cal.Rptr. 266, 639 P.2d 908], is controlling. As Justice Tobriner wrote: "Since the prosecution's first degree murder case was presented to the jury on a felony-murder theory as well as a premeditation theory, additional evidence of diminished capacity would have been largely irrelevant. Coun-

sel could have properly concluded that such psychiatric evidence as was available should be saved for the penalty phase in an effort to persuade the jury that appellant was an inappropriate candidate for the death penalty. Under these circumstances, we will not proceed to second-guess trial counsel's choice of tactics." (*Id.* at p. 585; see also *People* v. *Jackson* (1980) 28 Cal.3d 264, 290 [168 Cal.Rptr. 603, 618 P.2d 149].)

This defendant has been tried twice, by two different juries. Both heard the overwhelming evidence of his guilt, and both returned identical verdicts. I do not believe there has been a miscarriage of justice within the proscription of the Constitution (Cal. Const., art. VI, § 13) to justify requiring a partial third trial on the same charges more than seven years after the crimes were committed. I would affirm the judgment in its entirety.

Grodin, J., concurred.

**BIRD, C. J.,** Concurring and Dissenting.—I write separately to underscore several significant errors in the penalty phase proceedings which also require reversal of the penalty phase verdict.

## I.

The penalty jury was informed that in determining the appropriate penalty, it could consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." (Former CALJIC No. 8.88.1, see current CALJIC No. 8.84.2.) This instruction, based on former Penal Code section 190.3, subdivision (j) (now (k)), was not adequate to meet the demands of *Lockett* v. *Ohio* (1978) 438 U.S. 586, 605 [57 L.Ed.2d 973, 990, 98 S.Ct. 2954] and *Eddings* v. *Oklahoma* (1982) 455 U.S. 104 [71 L.Ed.2d 1, 102 S.Ct. 869], since it failed to tell the jurors that they were free to give independent mitigating weight to those aspects of appellant's character or record which did not pertain to the crime. Such an instruction is constitutionally required. (See *People* v. *Frank* (1985) 38 Cal.3d 711, 747-755 [218 Cal.Rptr. 801, 700 P.2d 415] (conc. & dis. opn. of Bird, C. J.); cf. *People* v. *Lanphear* (1984) 36 Cal.3d 163, 167-168 [203 Cal.Rptr. 122, 680 P.2d 1081]; *People* v. *Easley* (1983) 34 Cal.3d 858, 878-879 [196 Cal.Rptr. 309, 671 P.2d 813].)

In the present case, Frierson offered evidence of his stable family background, of his mother's devotion to him, and of her unsuccessful efforts to find help for his drug problem. Apparently his mother had repeatedly tried to obtain psychiatric help for him, but the public clinics had long waiting lists and serious cases ahead of him. She could not afford private help. She had visited him regularly while he was at the California Youth Authority.

When he was released at the age of 18, he returned to his home. He worked for his cousin's clothing business and later for his mother's business. He was still living at home part of the time when he was arrested.

The factor (j) instruction was not adequate to tell the jury that it could consider this evidence. Nothing else in the jury instructions communicated this message. An accompanying instruction, which directed the jurors to "consider, take into account and be guided by the . . . factors [listed in section 190.3], if applicable" (former CALJIC No. 8.88.1) suggests strongly that the jurors understood that they were restricted to the statutory list. This "ambiguity concerning the factors actually considered by the [sentencer]" (*Eddings* v. *Oklahoma, supra,* 455 U.S. 104, 119 [71 L.Ed.2d 1, 14] (conc. opn. of O'Connor, J.)) compels a reversal of the judgment of death.

## II.

At the penalty phase, the prosecution introduced evidence of two robberies, although Frierson had never been accused or convicted of these offenses. This evidence was offered in support of the statutory aggravating factor of "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence." (Former Pen. Code, § 190.3, subd. (b).)

As this court has recognized, a jury may not consider evidence of other crimes as aggravating circumstances unless it has first found that these crimes have been proven beyond a reasonable doubt. (*People* v. *Robertson* (1982) 33 Cal.3d 21, 53-54 [188 Cal.Rptr. 77, 655 P.2d 279].) Although the trial court apparently made an effort to instruct Frierson's jury on this reasonable doubt standard,[1] two errors in the manner in which the "other crimes" evidence was presented to the jury deprived appellant of a fair penalty trial.

First, the jury which "convicted" appellant beyond a reasonable doubt of these robberies was the jury which had just found him guilty of first degree murder with special circumstances. This alone violated his right to due process on the robbery offenses. A jury which had just convicted him of a capital crime could not have been an impartial fact finder on the truth of these other charges. Such a jury would have a very strong tendency—indeed, would be almost compelled—to find him guilty of the relatively less

---

[1] The record indicates that the jury was instructed to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence, which has been proved beyond a reasonable doubt." (CALJIC No. 8.88.1(b), as modified.)

serious robberies once it had heard all the guilt phase evidence showing him to be a person who commits first degree murders. This evidence should not have been presented to the jury at all until the robberies had been found true beyond a reasonable doubt by an impartial fact finder.

Second, the beyond-a-reasonable-doubt standard of proof of other crimes implies a requirement that the jury's verdict be unanimous. The purpose of the standard is to act as a hedge against hasty or ill-considered death penalty decisions. The standard obviously loses its effectiveness if we do not require jury unanimity. Yet, nothing in the instruction which was given to Frierson's jury told the jurors that they had to agree *unanimously* that he was guilty beyond a reasonable doubt of the robberies before they could consider them as factors in aggravation.

Unfortunately, the CALJIC instruction patterned after this court's *Robertson* opinion omits any requirement of a unanimity finding on the truth of other criminal activity.[2] That instruction is, in my view, incompatible with the demands of due process.

## III.

■■ ■■ These errors were significant and require a new penalty phase, even in the absence of the other errors.[3] (*People* v. *Robertson, supra,* 33 Cal.3d at p. 54.) On retrial, the court would be well-advised to give the new CALJIC instruction fashioned after *Easley* and to require a separate jury to determine unanimously the truth of the other crimes evidence beyond a reasonable doubt before permitting that evidence to be considered by the penalty phase jury.

---

[2]CALJIC No. 8.84.1.2 (1983 New) states: "Evidence has been introduced for the purpose of showing that the defendant [_____] has committed the following criminal [act[s]] [activity]: [_____] which involved [the express or implied use of force or violence] [or] [the threat of force or violence]. Before you may consider any of such criminal [act[s]] [activity] as an aggravating circumstance in this case, you must first be satisfied beyond a reasonable doubt that the defendant [_____] did in fact commit such criminal [act[s]] [activity]. You may not consider any evidence of any other criminal [act[s]] [activity] as an aggravating circumstance."

[3]I concur in the reversal of the special circumstance findings.