Filed 10/16/13  P. v. Villanueva CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G047170 |
| v. | (Super. Ct. No. 09NF2242) |
| DEXTER TAGUDIN VILLANUEVA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, John Conley, Judge.  Affirmed.

Keith J. Bruno for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Theodore M. Cropley, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury found defendant guilty of first degree residential burglary (Pen. Code, §§ 459-460, subd. (a); count 1)[1], assault with the intent to commit rape during the commission of first degree burglary (§ 220, subd. (b); count 2), two counts of forcible oral copulation (§ 288a, subd. (c)(2); counts 3 and 4), sexual penetration by a foreign object (§ 289, subd. (a)(1); count 5), and criminal threats (§ 422; count 6). The jury also found true the allegations that in the commission of counts 2, 3, 4, and 5, defendant committed a burglary within the meaning of section 667.61, subdivisions (b) and (e)(2), personally used a dangerous and deadly weapon within the meaning of section 667.61, subdivisions (b) and (e)(3) (former subd. (e)(4)), and used a knife within the meaning of section 12022.3, subdivision (a). The jury further found true the allegation that in the commission of counts 1 and 6, defendant personally used a knife, within the meaning of section 12022, subdivision (b)(l). The court sentenced defendant to an indeterminate state prison term of 25 years to life on count 3, and a consecutive term of 10 years on the section 12022.3, subdivision (a) enhancement, for a total state prison term of 35 years to life. The court imposed sentence on all other counts and enhancements, but stayed execution thereof pursuant to section 654.

On appeal, defendant raises three issues. First, he claims his constitutional right to an interpreter was denied. Second, he claims his right to testify was denied. Third, he claims his counsel was ineffective in failing to move to suppress certain DNA evidence. We affirm.

FACTS

On August 10, 2009, Rebecca arrived home from work around 7:00 p.m. Rebecca's husband was away on a business trip. After changing clothes and opening all

---

[1] All statutory references are to the Penal Code unless otherwise stated.

of the doors to cool the interior of her home, Rebecca did some gardening, turned on the pool pump, and barbecued herself a meal. After talking to her husband on the telephone, Rebecca went to the living room and watched television.

Around 9:00 p.m., Rebecca heard someone say, "Give me your money." She turned around and saw a man, whom she later identified as defendant, with part of his nose and mouth covered by a shirt or bandana. He was holding one of Rebecca's kitchen knives. When Rebecca told defendant that she did not have any money, he pushed her to the other end of the couch, put his hands on top of her blouse, and put a pillow on her face. Afraid, Rebecca told defendant that she had money in the kitchen.

Defendant began lifting Rebecca's blouse. Afraid that defendant was going to rape her, Rebecca pleaded with defendant not to hurt her; she begged him to just take her money and leave. Undeterred, defendant lifted up Rebecca's blouse and sucked her breasts. As Rebecca pleaded with defendant to stop, defendant groped Rebecca's crotch and told her that she had better do what he told her to do because he had a knife. Defendant told Rebecca, "I want your money and I want your pussy."

With the knife at Rebecca's collar bone, defendant took off her pants. Rebecca again begged defendant to stop. Rebecca began to yell for help, but defendant told Rebecca, ''I'm going to kill you. Just do what I say. Just comply and enjoy."

After taking Rebecca's pants off, defendant told her in English that his wife was dead and that he had not had sex in a long time. Defendant then continued to lick Rebecca's breasts and began to lick her vagina. Although defendant spoke to Rebecca in English, she thought she detected a slight Filipino accent. Desperate, Rebecca, who is also Filipino, told defendant in Tagalog, "Have mercy on me." Defendant said, "No comprendo" and continued to assault her. This went on for what Rebecca described as a very long time, during which he also began putting his fingers inside her vagina.

3

Sensing that defendant may be related to the Filipino family next door, Rebecca told defendant that she knew Bert, her neighbor. Defendant did not respond and continued assaulting Rebecca.

At one point during the assault, Rebecca told defendant that she needed water. Rather than getting Rebecca some water, defendant stuck his fingers in Rebecca's mouth and then again digitally penetrated her vagina. Defendant then spread the jello Rebecca had been eating on her vagina and licked it off, saying "sweet pussy, sweet pussy." Defendant then touched Rebecca's clitoris and asked her if she "came" yet.

At some point defendant pushed his flaccid penis against Rebecca's vagina, possibly slightly penetrating it. Defendant then took Rebecca's hand, made her masturbate him, and said, "Make it hard." Defendant then got on top of Rebecca and threatened to stab her if she did not suck his penis. Defendant forced her to suck his penis for about a minute. When defendant removed his penis from Rebecca's mouth, she tasted something bitter.

After he finished sexually assaulting her, defendant asked Rebecca where her money was. Rebecca told him it was in the kitchen. Defendant brought Rebecca's purse into the living room and took out her wallet. After taking over $100 from her wallet, defendant told Rebecca to close her eyes and not move.

Rebecca closed her eyes and stayed still for a few minutes. She then got up, locked the kitchen door, and called 911.

After the police arrived, Rebecca was taken to the hospital for a sexual assault exam. In addition to injuries to her eyelids, scratches on her neck, and bruises on her chest, shoulder, and thighs, Rebecca had redness and bruising in her vagina, and tears at the top and bottom of her vagina. At trial the prosecution expert testified that Rebecca's injuries were more consistent with a forcible nonconsensual sexual encounter than a consensual sexual encounter.

4

That same evening, Rebecca identified defendant in a photographic line-up as the man who sexually attacked her and took her money. After Rebecca identified defendant as her attacker, Anaheim Police Detective Omar Adham went to defendant's residence and contacted defendant. Detective Adham told defendant that something had happened near defendant's sister's house (the Filipino neighbors) and asked defendant if he would come to the station to talk. Defendant indicated to Detective Adham that he knew something had happened and agreed to talk to the detective at the station. As Detective Adham drove defendant to the station, he told defendant that he was not under arrest, did not have to talk to the police, and that he would be driven home when he was done talking.

During his interview at the police station, defendant acknowledged he was at his sister's house earlier that evening and that he left around 10:00 p.m. Although at first defendant denied knowing who lived in Rebecca's house, he eventually admitted that he knew a husband and wife lived there and that he occasionally said "hi" to them in passing. Defendant denied that he ever left his sister's house to go over to Rebecca's residence.

Defendant agreed to have a buccal swab taken from his mouth. Defendant also consented in writing to a search of his residence and car. After a break in the interview, Detective Adham told defendant that Rebecca had been sexually assaulted and that defendant was a person the police wanted to talk to. Defendant again denied seeing Rebecca earlier that night and denied that he was having any type of intimate affair with her.

Defendant then told the police that he wanted to go home. After defendant refused to consent to a penile swab, Detective Adham took defendant back to his residence. The police searched defendant's residence and vehicle but did not collect any evidence.

5

Detective Adham then placed defendant under arrest. A forensic technician performed a "sexual assault kit" on defendant. The prosecution and defense reached a stipulation that defendant's DNA was found on Rebecca's body and that a mixture of defendant's DNA and Rebecca's DNA was found on defendant's body.

The next day, Detective Adham found a knife in the backyard of defendant's sister's house. The knife was the same type of knife as the one the attacker took from Rebecca's kitchen and used on her during his attack.

Defendant's sister, Marites Jarcia, acknowledged that she lived next door to Rebecca in August 2009 and that defendant had been at her house in the evening of August 10, 2009, "hanging out" in the back yard with her husband, nephew, and other brother. When her husband went to the movies around 9:00 p.m., defendant did not go with him. Jarcia, who had a migraine, went upstairs to rest around that time.

At the arraignment setting, a public defender was appointed to represent defendant and defendant waived time for arraignment, with no Tagalog interpreter being present. A little less than a month later, defendant was back in arraignment court, this time with a Tagalog interpreter present, and he again waived time for arraignment. On October 9, 2009, defendant appeared yet again in arraignment court, with a Tagalog interpreter present, and entered a "NOT GUILTY" plea to all counts of the complaint.

Afterwards various pretrial hearings occurred, including a preliminary hearing. Defendant had an interpreter at all of these hearings. Sometime after the preliminary hearing, private counsel substituted in for defendant, at which point there is a notation in the minutes that defendant stated "he/she does not need an interpreter." The case was called for trial and continued several times thereafter; defendant did not have an interpreter at these hearings.

Prior to jury selection the court took a personal waiver of defendant's right to an interpreter, but informed defendant he could change his mind at any time. The next day defendant requested an interpreter. Two prospective jurors were dismissed before an

6

interpreter could be located. Defendant had an interpreter for the remainder of the proceedings, including trial.

At trial a jury found defendant guilty of first degree residential burglary, assault with the intent to commit rape during the commission of first degree burglary, two counts of forcible oral copulation, sexual penetration by a foreign object, criminal threats, and found the various enhancements noted above to be true. The court sentenced defendant to 35 years to life in state prison.

DISCUSSION

*Defendant Waived His Right to an Interpreter; Any Error Was Harmless*

Defendant first contends the court denied his constitutional right to an interpreter. "A person unable to understand English who is charged with a crime has a right to an interpreter throughout the proceedings." (Cal. Const. art. I, § 14.) "California's Constitution does not provide a half measure of protection. Rather, it requires that when an interpreter is appointed for a criminal defendant, that interpreter must be provided to aid the accused during the whole course of the proceedings." (*People v. Aguilar* (1984) 35 Cal.3d 785, 790 (*Aguilar*).) "The defendant's right to understand the instructions and rulings of the judge, the questions and objections of defense counsel and the prosecution, as well as the testimony of the witnesses is a continuous one. At moments crucial to the defense — when evidentiary rulings and jury instructions are given by the court, when damaging testimony is being introduced — the non-English speaking defendant who is denied the assistance of an interpreter, is unable to communicate with the court or with counsel and is unable to understand and participate in the proceedings which hold the key to freedom." (*Id.* at pp. 790-791.)

The right to an interpreter, however, may be waived. To be effective, a court must take a personal waiver from the defendant and there must be "'an "affirmative

7

showing," on the record, of waiver which was "intelligent and voluntary" on the part of the affected defendant.'" (*Aguilar*, *supra*, 35 Cal.3d at p. 794.)

Here, the court and defendant engaged in the following colloquy regarding waiving the right to an interpreter:

"[The Court:] The use of interpreters. If there's interpreters, I have to talk to the jury about that. [Defendant], will you need an interpreter, do you think?

"The Defendant: No, sir.

"The Court: Okay, you have not used one up till now, I gather?

"The Defendant: Yes, sir. Yes, before.

"[Defense Counsel]: He has used an interpreter before, but ever since I've been on the case he hasn't.

"The Court: Well, this is your trial. You want to be sure you understand everything.

"The Defendant: Yes, sir. When I have interpreter it makes me confused.

"The Court: Because you're hearing two languages at the same time?

"The Defendant: Yes.

"The Court: Well, let's leave it this way: we will start without an interpreter. But if you change your mind at any time, just let us know.

"The Defendant: Okay.

"The Court: Because it's very important you understand everything. And it's not good enough, you know, when you're in the grocery store if you understand 90 percent, you get your milk and you get your cereal. But in court, if you're only 90 percent you could miss something very important.

"The Defendant: Okay, your honor.

"The Court: So, we will start. And jury selection will be a good example, because you personally don't have to understand everything at that point. And if you have any doubt about your understanding, just say I want an interpreter, okay?

8

"The Defendant: Okay, your honor, thank you."

We are persuaded this was a knowing and voluntary waiver. Defendant responded intelligently to all of the court's questions and comments and even explained his reason for not wanting an interpreter. We cannot expect a court to *force* an interpreter on the defendant in these circumstances, particularly since, according to defendant, that may have only caused more confusion. Further, the court took pains to emphasize its willingness to provide an interpreter at defendant's request, and thus defendant's waiver was not under any sort of pressure or coercion.

Defendant cites *Aguilar*, *supra*, 35 Cal.3d 785, for the proposition that where, as here, an interpreter was previously provided, a waiver may not be taken in English. *Aguilar*, however, is distinguishable. There, the defendant was a non-English speaker. (*Id.* at p. 791 fn. 6.) The court appointed an interpreter but "borrowed" the interpreter to function as a witness interpreter for two of the prosecution's key witnesses. Defense counsel acquiesced, but the court never consulted the defendant. (*Id.* at p. 789.) In rejecting the People's claim that defendant waived an interpreter, the court stated, "An exchange took place — entirely in English — between the court, the prosecutor, the interpreter, and defense counsel. The defendant was excluded. This conversation, being a 'babble of voices' to the defendant, cannot be held to amount to a waiver by him of his right to an interpreter." (*Id.* at p. 795, fn. omitted.) This exchange, the court noted, "also demonstrates the necessity of requiring personal waiver of the right to an interpreter." (*Id.* at p. 791, fn. 6.)

Here, the court took a personal waiver and we are not dealing with a non-English speaker. As the court noted, defendant may not be so proficient in English that he could fully understand everything that was happening, but the waiver conversation itself demonstrates he had a sufficient grasp of English to understand the waiver. As additional evidence of defendant's English proficiency, the detective who interviewed defendant testified the interview was in English and defendant's answers were responsive

9

to his questions.  He further testified defendant never asked for an interpreter or indicated he had any difficulty understanding the detective's questions.  In short, the waiver here was not a "babble of voices" as in *Aguilar*, but instead an intelligent conversation in which defendant participated.  Accordingly, the waiver was valid.

Even if the court had erred, moreover, we would find the error harmless.  Contrary to defendant's claim that a "deprivation of [the] right to understand the proceedings is necessarily prejudice," the denial of a right to an interpreter is reviewed under the *Chapman*[2] standard under which we will affirm if the error was harmless beyond a reasonable doubt.  (*People v. Rodriguez* (1986) 42 Cal.3d 1005, 1010.)  "In utilizing this standard 'it is our task to examine the entire record and "if . . . it appears reasonably possible that the error might have materially influenced the jury in arriving at its verdict," the judgment must be reversed.  [Citations.]'  [Citation.]  In addition, a court 'must weigh the impact of the error not only on the decision of the jury, but also on the course of the trial.'"  (*Id.* at p. 1012.)  "Thus, among possible indications of actual interference with defendant's rights which may appear on the record are remarks by counsel, the court, or defendants themselves.  In other instances, the fact that a defendant who does not speak English has been left without means of communication or comprehension will be equally obvious without reference to express remarks made during the proceedings.  Nonetheless, in some cases, even where some deprivation is shown, the absence of a personal interpreter may be found harmless because the proceedings which took place while the interpreter was absent may be insubstantial or concern matters which are not possibly prejudicial to the defendant, or because there is no allegation that the deprivation actually affected any of the defendant's rights."  (*Id.* at p. 1015.)

---

[2]     *Chapman v. California* (1967) 386 U.S. 18.

Both of the latter circumstances are present here:  defendant does not claim the alleged error was prejudicial, and the hearing at which defendant did not have an interpreter was inconsequential.  To begin with, because defendant erroneously claims the absence of an interpreter is *per se* prejudicial, he does not bother to explain how it was actually prejudicial in this case.  Based on our review of the record, we conclude beyond a reasonable doubt the error, if any, was harmless.  At the hearing where defendant waived his right to an interpreter, aside from that waiver, the court simply informed defendant that if he chose to testify, the court would not allow certain of his prior convictions to be mentioned (which is obviously favorable to the defendant).  At the next hearing defendant requested an interpreter.  Although there was no interpreter available at the time, at that hearing the court merely made some minor corrections to the information that defense counsel agreed to and gave some brief instructions to a group of prospective jurors, asking them to return the next day.  Afterwards, two prospective jurors approached the court and asked to be excused.  One juror claimed a medical condition that caused him to randomly fall asleep when sitting still.  Another claimed he was on active duty with the National Guard and could be called away at any time.  Defendant's attorney, the prosecutor, and the court all agreed to excuse these two jurors.  Nothing else occurred at the hearing, and the next morning defendant requested and was given an interpreter.  The hearing was plainly inconsequential.  Accordingly, any error was harmless.[3]

_____

[3]  Defendant also contends his right to an interpreter was violated at eight different pretrial hearings.  Defendant contends, "the record is unacceptably silent as to why Mr. Longwith [defendant's prior counsel] substituted in and, for the first time, made the decision that Appellant did not require an interpreter and proceeded to have Appellant ostensibly waive that right without the benefit of an interpreter interpreting the waiver."  We agree the record is unacceptably silent, as we have only cursory descriptions in the court's minutes as to what occurred at these hearings, none of which touch on the subject of an interpreter other than to note "Defendant states that he/she does not need an interpreter."  The consequence of the "unacceptably silent" record, however, is affirmance, as "it is the appellant's burden to provide an adequate record on appeal."  (*In*

11

*Defendant Was Not Denied His Right to Testify*

Defendant contends he was denied his right to testify. His contention is based on an allegedly confusing personal waiver of that right the court took, together with certain comments defense counsel made that allegedly indicate counsel did not adequately discuss the right to testify with defendant. We are not persuaded.

"'[T]he right to testify in one's own behalf is of such fundamental importance that a defendant who timely demands to take the stand contrary to the advice given by his counsel has the right to give an exposition of his defense before a jury. [Citation.] The defendant's insistence upon testifying may in the final analysis be harmful to his case, but the right is of such fundamental importance that every defendant should have it in a criminal case.'" (*People v. Frierson* (1985) 39 Cal.3d 803, 813.) "'[A] defendant's right to testify in his own behalf is merely one of many rights guaranteed by the Fourteenth Amendment to the federal Constitution to insure a fair trial [citation]. Like the right to produce evidence and to confront and cross-examine adverse witnesses, it must be exercised with caution and good judgment, and with the advice and under the direction of competent trial counsel. It necessarily follows that a trial judge may safely assume that a defendant, who is ably represented and who does not testify is merely exercising his Fifth Amendment privilege against self-incrimination and is abiding by his counsel's trial strategy . . . .'" (*People v. Bradford* (1997) 14 Cal.4th 1005, 1053.) "*No . . . personal waiver is expressly required for a defendant to waive his right to testify.*"[4] (*Bradford*, at p. 1053, italics added.)

re Raymundo B.* (1988) 203 Cal.App.3d 1447, 1452 [defendant provided insufficient record to support claim that right to interpreter was violated].)

[4] Defendant cites a series of federal circuit court cases holding, with some variation in language, that defendant's waiver of the right to testify must be knowing, voluntary, and intelligent. To the extent defendant cites those cases for the proposition that the court must take a personal waiver of the right to testify, we, of course, are bound by our own high court and not federal circuit courts. (*People v. Williams* (1997) 16

Although not required, the court did take a personal waiver of defendant's right to testify:

"[The Court:] The other issue is the defendant's right to testify. [Defendant], I understand you've talked to your attorney and you've decided not to testify? Is that correct?

"The Defendant: Yes, sir.

"The Court: Any questions about that?

"The Defendant: No.

"The Court: All right, I just have to be sure since it's your decision, you have to listen to what your attorney says, but it is your decision that you understood what you were doing. You feel you do understand?

"The Defendant: Yes, your Honor."

Defendant contends the statement "you have to listen to what your attorney says" suggests the decision is not defendant's but ultimately the attorney's. Defendant reads too much into that statement. The court was simply instructing the defendant that he must take into account his attorney's advice. The case law cited above fully supports that admonition. Notably, the court twice repeated "it's your decision." There was nothing misleading about the court's comments.

Defendant also claims his attorney failed to adequately discuss the right to testify with defendant. He arrives at this conclusion based on various comments defense counsel made throughout the proceedings.

First, he claims "at no time during the pretrial preparation of the case, did Mr. Rogers ever communicate with Appellant in his language, as is required by the Constitution." In support of this conclusion he cites the fact that no interpreter had been appointed prior to the first day of trial. It does not follow, however, that defense counsel

Cal.4th 153, 190.)

13

never utilized an interpreter in private discussions with defendant. Nor, as we noted above, are we convinced an interpreter was necessary for such discussions.

Second, the day before the prosecution rested, the judge asked defense counsel if defendant had decided whether to testify, and counsel responded, "No, we're going over that tonight." "Inferentially," defendant claims, "the discussion about whether or not to testify (and the required attendant advice) had not yet happened on the cusp of the defense case." We are not aware of any rule, and defendant has not cited any, requiring counsel to discuss the defendant's right to testify at any particular time. Further, defendant is again reading more into the comment than is there. Defense counsel was responding to the question, "Has your client made up his mind whether or not to testify?" The response, "No," simply meant a decision had not been made, not that it had not been discussed.

Third, on that same day, just before the lunch break, the court asked, "Has [defendant] made his decision? [¶] [Defense Counsel:] He hasn't but we're leaning against it. But I would, I prefer to have tonight to go over it with him, if possible." The judge asked defense counsel to look for a particular CD produced in discovery over the lunch hour. Defendant concludes, "Presumably, over the lunch hour, defense counsel followed the court's orders and looked for the CD at his office and then coordinated with [an expert witness]. There did not appear to be time to advise the client." This is pure speculation on defense counsel's part.[5]

Although defendant's waiver occurred that afternoon, we will not presume that defense counsel failed to properly advise his client absent a clear indication in the record. That is not the case here.

---

[5] Defense counsel on appeal was not defendant's trial counsel.

14

*There Was No Prejudice from Counsel's Alleged Ineffective Assistance in Failing to Move to Suppress DNA Evidence Collected from Defendant's Person*

Defendant claims his counsel was ineffective in failing to move to suppress DNA evidence gathered from a sexual assault exam of defendant taken shortly after defendant was arrested. The sexual assault exam revealed the presence of both defendant's and the victim's DNA.

"To prove an ineffective assistance claim, a defendant must show that (1) 'counsel's performance was deficient,' *and* (2) 'the deficient performance prejudiced the defense.' [Citation.] A court need not 'address both components of the inquiry if the defendant makes an insufficient showing on one.'" (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1121, italics added.) "To prove prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.] 'When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" (*Nguyen*, at p. 1121.)

Here, the ineffective assistance, if any, was plainly harmless, and defendant hardly contends otherwise. His only nod to the requirement of showing prejudice is his conclusory statement, "Had counsel for Appellant indeed challenged this seizure, there is a reasonable probability, based on the pertinent facts, that the DNA results from the penile swab would have been suppressed and the government's case against Appellant would have been significantly weakened at trial." Defendant does not elaborate on how the prosecution's case would have been weakened.

Defendant is wrong for two reasons.

First, it was stipulated that sperm matching defendant's DNA was found on the victim's hand and abdomen. Even without the DNA evidence collected from

15

defendant's penis, therefore, there was already DNA evidence connecting defendant to the crime.

Second, probably for that reason, the issue at trial was not identity. Defendant's theory at trial was that the sexual encounter was consensual. He conceded identity. For example, in discussing certain footprints found leading away from the victim's house, counsel stated, "Now, the footprint, . . . those are his footprints, there's no dispute about that, okay. . . . There's no dispute that that's him."

In short, the DNA evidence from the penile swab had no significant impact on the outcome of the trial. Because there was no prejudice, we need not address whether counsel's failure to file a suppression motion was ineffective assistance.[6]

DISPOSITION

The judgment is affirmed.

IKOLA, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

BEDSWORTH, J.

---

[6] We do note, however, that defendant relies on *People v. Fulton* (May 18, 2012, C065057) review denied and opinion ordered decertified August 22, 2012, S203483, for the proposition that exigent circumstances do not support a warrantless search of the intimate parts of a defendant arrested for rape. Citation to *Fulton* is improper as that case was decertified.

16