Filed 3/8/16  P. v. Villegas CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B257830 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA094373) |
| v. | |
| JOSEPH VILLEGAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James Otto, Judge.  Affirmed.

R.J. Manuelian for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Stephanie A. Miyoshi and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

Joseph Villegas appeals from a judgment of conviction entered after a jury found him guilty of first degree murder (Pen. Code, § 187, subd. (a)) and found true the allegations that he personally used, and personally and intentionally discharged a firearm, in the commission of the crime, causing great bodily injury or death (*id.*, § 12022.53, subds. (b), (c) & (d)).  The jury found not true the allegation that the crime was committed for the benefit of a criminal street gang (*id.*, § 186.22, subd. (b)(1)(C)).  The trial court sentenced him to 50 years to life in prison.  On appeal, defendant challenges the denial of his motion for new trial, claiming that his trial counsel rendered ineffective assistance by failing to fully investigate and raise the issue of voluntary intoxication in mitigation of his crime.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    THE MURDER TRIAL

On December 31, 2012, David Diaz had a party at his house in Wilmington, California.  Diaz and a number of his guests were members of a gang called Westside Wilmas, including defendant, Juan Quezada, Ruben Krueger, and Armando Soriano (a.k.a., "210").  During the party, numerous gunshots were fired, and three gang members were hit:  Quezada was fatally shot in the back of the head; defendant was shot in the legs; and Krueger was shot in the head and superficially wounded.

At trial, Krueger was the only eyewitness who identified defendant as the person who shot Quezada.  He testified that defendant and Quezada were arguing about which was the first Westside Wilmas clique.  Krueger was a couple of feet away from them and heard a gunshot when he was looking down at his phone.  When he looked up, Krueger saw defendant pointing a gun at Quezada, who was grabbing the back of his head.  The gun, a black 9 millimeter semi-automatic with an extended magazine, appeared to jam as defendant tried to shoot again.  Krueger saw defendant try to unjam the gun after it jammed.  Seconds later, someone other than defendant fired five to ten more shots.

2

Krueger tried to get away, but was struck in the back of the head and fell. He saw defendant run past him toward the street while carrying a gun.[1]

Krueger admitted to being seriously impaired when he witnessed the shooting. He was high on crystal methamphetamine, had been drinking alcohol, and had not slept for a day or two. He also acknowledged that he was testifying for the prosecution under a grant of use immunity, and that the police had relocated him and his family and given them money to move in exchange for his cooperation.

Diaz and Soriano also testified at trial. Diaz said that he heard a few gunshots while inside the house but did not hear any argument or see the shooting. When Diaz went to the backyard, he saw defendant on the ground and "another body" by the garage. Diaz never saw defendant with a gun and did not see defendant run toward the street after the shooting. Soriano testified he was not at the party, even though Krueger saw him there that day. Soriano did acknowledge, however, that he had received a phone call from Quezada's brother, Freddy Quezada (Freddy), demanding to know what happened to Quezada. When Soriano said he did not know, Freddy became angry, and Soriano ended the call. At Quezada's funeral, Freddy approached Soriano and offered him $5,000 to testify about his brother's murder, but Soriano refused.

Freddy denied offering Soriano any money. Freddy testified that, after the shooting, he received a phone call from someone who identified himself as a member of the Westside Wilmas named "210." The caller said that he saw defendant shoot Quezada after the two had gotten into an argument, and that defendant then tried to shoot "210" but his gun jammed. As defendant was trying to unjam it, "210" grabbed his own gun and shot at defendant's legs to prevent him from escaping. "210" was afraid he would be arrested for attempted murder and asked for Freddy's help.

The ballistic evidence at trial revealed that at least two guns were involved in the shooting, though only one gun was recovered. The police found that gun and two

---

[1] Krueger previously had identified defendant as the shooter when speaking to the police after being released from the hospital.

magazines in a truck belonging to Diaz's father that was parked across the street from his house. The larger magazine had been inserted into the gun incorrectly. No usable fingerprint or DNA evidence was found on the gun, the bullets, or the casings found at the scene.

**B. NEW TRIAL MOTION**

After the trial, attorney R.J. Manuelian substituted in as defense counsel in place of Michael D. Shook. Manuelian filed a motion for new trial based on a claim of ineffective assistance of counsel. He asserted that Shook had "committed egregious error by not conducting a thorough interview of [defendant] prior to trial, ignoring his claim that he was intoxicated at the time of this incident," and failing to "us[e] a forensic blood/alcohol expert to establish high levels of intoxication to negate the murder element of malice aforethought."

In support of the new trial motion, Manuelian submitted his declaration describing his interview with defendant. Defendant was unable to provide any details about the shooting. He said that "he was inebriated from drinking alcohol all night and could not remember what happened other than becoming more lucid while he was at the hospital after receiving medication." Defendant said that he reported this information to Shook— whom he met only once—and that Shook "did not ask any follow up questions." In addition to his declaration, Manuelian submitted evidence that defendant's blood-alcohol level was above .20 percent when he was treated for his gunshot injuries.

The trial court conducted an evidentiary hearing on the new trial motion. Shook was the only witness to testify.[2] He explained that he was privately retained by defendant, and that he had spent about five hours with his client prior to trial. While defendant told him that he had been drinking beer all day, he did not say that he had smoked methamphetamine. Defendant never told him that he could not remember what

_____

[2] The only other evidence before the trial court was a stipulation to the testimony as expressed in the declaration of the defendant's forensic expert.

4

happened because of his intoxication. Shook obtained defendant's medical records, but chose not to have them reviewed by a forensic expert.

Shook's decision not to pursue the intoxication evidence was deliberate and tactical. He explained that, throughout the entire representation, defendant claimed that he did not shoot Quesada. Shook testified that "from the very moment [he] met [defendant], and consistently throughout, he denied his culpability. He said he didn't do it." Shook also met frequently with defendant's wife and mother, who told him that defendant steadfastly maintained that he did not do the shooting. Thus, Shook elected to proceed with an identification defense, challenging the prosecution's evidence that defendant was the shooter.

In making this election, Shook was aware that intoxication potentially could negate an element of the murder charge. But he chose not to follow up on the intoxication evidence because "it was inconsistent with [his] theory of the defense." Moreover, defendant never claimed that he was so intoxicated that he could not recall whether he had shot Quesada. On the contrary, defendant repeatedly maintained his innocence. Shook testified that during their conversations, defendant described the sequence of events surrounding the shooting and was "consistent throughout." Defendant said he was leaning against a wall or fence when the shooting started, and he tried to leave but could not stand up because he had been shot in the legs. He crawled to a fence, pulled himself over it, and went down an alley, where the paramedics found him. Though he did experience blackouts, none occurred during the shooting. Defendant "was very adamant that he did not fire the weapon, did not handle the weapon, did not shoot the victim."

Based on all the evidence, Shook decided to contest identification, rather than raise intoxication, at trial. He concluded that he had a better chance of prevailing on his chosen defense theory because of the problems in the prosecution's case. The prosecution had no physical evidence tying defendant to the murder weapon; and he could attack the reliability of the prosecution's key witness, Krueger, by offering significant impeachment evidence, including Diaz's testimony that defendant did not run

5

toward the street after the shooting, as Krueger claimed. Having opted to challenge the identification evidence, Shook did not believe he also "credibly" could offer the jury an alternative intoxication theory. For this reason, Shook did not investigate that defense theory further.

Upon the conclusion of the hearing, the trial court denied the motion for a new trial. Having "sat through this trial" and having heard the evidence at the hearing on the new trial motion, the court concluded: "Mr. Shook obviously selected a strategy that was consistent with what his client was telling him, and it was the best strategy that he could use in this case to get the result his client was asking him and demanding him to get." The court further concluded that Shook had no obligation to conduct additional investigation into an intoxication theory.

## DISCUSSION

Defendant's entire appeal is based on his claim that his prior counsel rendered ineffective assistance by failing to fully investigate and raise an intoxication theory. This claim must be rejected under controlling legal principles.

### A. THE CONTROLLING LEGAL PRINCIPLES

The defendant moved for a new trial based on his claim of ineffective assistance of counsel. Because of its constitutional dimension, such a claim, though not set forth in Penal Code section 1181, is a well-recognized basis for obtaining a new trial. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582-583; accord, *People v. Callahan* (2004) 124 Cal.App.4th 198, 209 [noting that such claims implicate due process].)

The seminal case establishing the standard for an ineffective-assistance claim under the Sixth Amendment is *Strickland v. Washington* (1984) 466 U.S. 668 [104 S.Ct. 2052, 80 L.Ed.2d 674] (*Strickland*). As explained by the California Supreme Court, the *Strickland* standard requires that the defendant carry a two-part burden. (*People v. Ledesma* (2006) 39 Cal.4th 641, 745-746; accord, *People v. Lopez* (2008) 42 Cal.4th 960, 966.) First, the defendant must establish that his counsel's performance "'fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citations.]" (*Ledesma*, *supra*, at pp. 745-746.) If the defendant fails to satisfy this

6

burden, counsel's performance shall be presumed to be competent and his or her actions shall be presumed to be explicable "'as a matter of sound trial strategy.'" (*Id*. at p. 746.) Second, the defendant must demonstrate prejudice by showing by a "'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' [Citation.]" (*Ibid*.)

The United States Supreme Court has admonished courts to exercise caution in evaluating a lawyer's performance:

> "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.]"

(*Strickland*, *supra*, 466 U.S. at p. 689.)

This strong presumption becomes virtually impenetrable when defense counsel engages in informed strategic decision making. A trial requires a complex series of tactical decisions. Among other complicated tasks, competent counsel must consider the implications of presenting potentially conflicting or confusing defense theories. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 1007.) "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the

7

available facts." (*People v. Bolin* (1998) 18 Cal.4th 297, 333; accord, *People v. Vines* (2011) 51 Cal.4th 830, 876.)[3]

## B. THE INEFFECTIVE ASSISTANCE CLAIM

Defendant's ineffective assistance claim—faulting trial counsel for choosing one defense theory over another—collapses under the weight of the *Strickland* standard. He contends that Shook's performance was objectively unreasonable because he failed to investigate and present evidence of intoxication, and because he neglected to request jury instructions on voluntary intoxication and involuntary manslaughter. We reject this contention, finding that defense counsel made a sufficiently informed strategic decision that is not subject to judicial second-guessing with the benefit of hindsight.

The decision whether to present seemingly inconsistent defenses is one of the more difficult ones facing trial counsel. Though familiar to lawyers and judges, the concept of alternative theories may not be as easy for jurors to grasp, at least when the theories appear conflicting. For many jurors, it could be confusing to hear defense counsel argue that the defendant did not kill the victim, but that if he did do so, he did not know what he was doing because he was unconscious at the time. This is not to say that the two theories cannot be logically and factually squared. But it is undeniable that the "I did not do it" defense may be seriously undermined by the "I was unconscious when I did it" defense. The decision whether to advance one or both defenses will depend on numerous variables, including an evaluation of the strengths and weaknesses of each.

In this case, Shook had a client who repeatedly insisted that he did not shoot Quezada. The prosecution had no physical evidence to link defendant to the murder weapon, as there was no fingerprint or DNA evidence on the gun. Nor did the prosecution have a confession. What the prosecution had was a single eyewitness to the

---

[3] After hearing Shook's testimony, the trial court concluded that Shook made a reasonable strategic decision. We review that conclusion for an abuse of discretion, at least with respect to the findings of fact underlying that conclusion. (See *People v. Callahan*, *supra*, 124 Cal.App.4th at pp. 209-211.)

shooting, Krueger—who was quite vulnerable to attack. Krueger was a methamphetamine user who was high on a powerful combination of methamphetamine and alcohol and who was seriously sleep deprived at the time of the shooting. In addition to challenging Krueger's reliability in recalling and reporting facts, Shook had substantial evidence of bias in the form of money and immunity that Krueger received in exchange for assisting the prosecution. Shook also had a witness, Diaz, who contradicted Krueger on a material fact. Thus, the information known to Shook supported a reasonable tactical decision to focus the defense on challenging the identification of defendant as the shooter. (*People v. Hinton* (2006) 37 Cal.4th 839, 877.)[4]

On the other hand, an intoxication theory faced significant legal and factual obstacles. Legally, even if the defendant were to prevail on this challenging theory, his success would only be partial. Under California law, voluntary intoxication can be used to negate the specific intent to kill required to prove second degree murder under an express malice theory and the deliberation and premeditation required to prove first degree murder. (Pen. Code, § 29.4, subd. (b); accord, *People v. Turk* (2008) 164 Cal.App.4th 1361, 1378.) Because voluntary intoxication does not negate the mental state required to prove implied-malice murder, a defendant will be liable for second degree murder if he or she acts with conscious disregard for human life while voluntarily intoxicated. (*Turk*, *supra*, at pp. 1376-1377 ["To the extent that a defendant who is voluntarily intoxicated unlawfully kills with implied malice, the defendant would be guilty of second degree murder."].) For a homicide to be considered involuntary manslaughter due to voluntary intoxication, it must be shown that the defendant was intoxicated to the point of being unconscious. (*Id*. at pp. 1378-1379.) A defendant is

---

[4]     This defense depended largely but not entirely on attacking Krueger's testimony. Freddy testified that Soriano had told him that defendant was the shooter, though this evidence also turned on a credibility determination—i.e., whether to believe Soriano or Freddy.

"unconscious" if he "lack[ed] awareness of his actions during the course of the offenses." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 418.)

Factually, the challenges facing Shook in presenting an intoxication theory were formidable. Defendant did not suggest to Shook that he was unable to recall the shooting or that he was unaware of his actions during the shooting. On the contrary, he adamantly denied being the shooter. Beyond the persistent denials, he explained details leading up to and following the shooting. Before the shooting, he was leaning up against a wall or fence, and as soon as he heard the gunshots, he attempted to leave but was unable to do so because he had been shot in the legs. He recalled crawling to a fence and pulling himself over it to escape the shooting. Defendant's memories were specific and his actions purposeful, reflecting a substantial level of cognitive functioning. In addition, Krueger described defendant's actions as being deliberative and goal-oriented. Defendant was lucid enough to argue about gang history, and when his gun jammed while shooting Quezada, he had sufficient cognitive awareness to recognize the problem and attempt a solution so that he could continue shooting.

The facts known to Shook thus did not suggest a promising intoxication theory. Negating specific intent to kill would be difficult—especially with evidence that defendant attempted to unjam his gun to continue shooting at close range—and would expose defendant to 40 years to life in prison even if he were successful. As for involuntary manslaughter, defendant's exposure would be far less (14 years), but so were his chances of success. Indeed, it is far from certain that defendant would have been entitled to an involuntary manslaughter instruction on the facts here.[5] (*People v.*

---

[5] In his new trial motion, defendant claims that he told Shook that he "could not remember what happened on the night of [the] incident" other than "waking up at the hospital and being informed that [he] was shot." In denying the motion, the trial court clearly rejected defendant's post-conviction statement and accepted Shook's account of what he had been told, finding that "Shook obviously selected a strategy that was consistent with what his client was telling him." Thus, we evaluate Shook's performance based on his account of what he was told. (*Strickland*, *supra*, 466 U.S. at p. 689

10

*Halvorsen*, *supra*, 42 Cal.4th at pp. 418-419 [holding that the trial court properly refused the requested unconsciousness instruction when the defendant's testimony demonstrated purposeful action, despite expert's opinion that the defendant's blood-alcohol level approached .20 percent and that the defendant frequently experienced memory losses from excessive drinking]; *People v. Carlson* (2011) 200 Cal.App.4th 695, 704 [holding that the evidence was insufficient to support an unconsciousness instruction in a murder case despite defendant's testimony that she did not recall driving the car involved in her passenger's death and her expert's opinion that the defendant "suffered an alcohol-related blackout on the night of the accident"].)

On appeal, defendant recognizes that the "evidence of voluntary intoxication would have conflicted with the identification defense presented at trial," but faults Shook for not "fully" investigating this potential defense theory. However, this is not the standard of performance by which courts measure whether counsel rendered ineffective legal assistance. "In *Strickland*, the Supreme Court specifically addressed counsel's duty to investigate and made clear courts should not equate effective assistance with exhaustive investigation of potential mitigating evidence: '[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" (*In re Andrews* (2002) 28 Cal.4th 1234, 1254, quoting *Strickland*, *supra*, 466 U.S. at pp. 690-691.)

Applying the *Strickland* standard, we cannot say that Shook's failure to further investigate the intoxication evidence was constitutionally deficient. When Shook made his decision, he had information that his client had been drinking heavily and was

_____

[requiring that evaluation of defense counsel's performance be made from "counsel's perspective at the time"]; accord, *People v. Bolin*, *supra*, 18 Cal.4th at p. 333 [same].)

intoxicated before the shooting, but he also knew that his client had specific recollections surrounding the shooting. Not only did defendant adamantly deny firing the weapon, he provided details leading up to and following the shooting. This level of awareness did not bode well for an intoxication theory. Moreover, because an intoxication theory would conflict with the identification defense, Shook would have to be prepared to concede that defendant was the shooter (or at least assume the risk that the jury would construe the intoxication theory as so conceding). This concession, in turn, would undercut the intoxication theory because it effectively would prevent Shook from challenging Krueger's testimony that defendant was intent on killing even after his gun jammed.

Based on the information he had at the time, Shook was in a position to make a reasonable professional judgment that he would not jettison the identification defense in favor of an intoxication theory that had a limited chance of success and that potentially would yield only a limited benefit if successful. This case thus falls within the principle that "valid strategic choices are possible even without extensive investigative efforts." (*In re Andrews*, *supra*, 28 Cal.4th at p. 1254.)[6] This distinguishes the cases upon which defendant relies. (E.g., *People v. Mozingo* (1983) 34 Cal.3d 926, 934 [counsel neglected to investigate an insanity or diminished capacity defense in favor of "an uncorroborated alibi defense" despite defendant's confession that implicated him in the crime but raised serious mental health issues]; *Crandell v. Bunnell* (9th Cir. 1998) 144 F.3d 1213, 1217 [counsel failed to do virtually any investigation and thus neglected to develop any defenses], overruled on other grounds by *Schell v. Witek* (9th Cir. 2000) 218 F.3d 1017, 1025.)

In short, defendant has not demonstrated that he was deprived of his constitutional right to the effective assistance of counsel. (See *People v. Mesa* (2006) 144 Cal.App.4th 1000, 1007 [defendant bears the burden of demonstrating inadequate representation].)

---

[6] From this conclusion it follows that Shook was not ineffective in failing to request jury instructions based on voluntary intoxication and involuntary manslaughter.

12

"[C]ounsel does not render ineffective assistance by choosing one or several theories of defense over another.  [Citation.]"  (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 1007.) This is especially true when the choice is between seemingly inconsistent theories.  (*Ibid.* [arguing that the defendant was too intoxicated to have intended to kill "would have conceded defendant was the killer, in contravention of the chief defense theory"]; accord, *People v. Thomas* (1992) 2 Cal.4th 489, 531-532 ["[T]he inconsistency inherent in arguing both innocence and lack of premeditation or deliberation would be apparent to the jury and would likely draw prosecutorial comment.  That the two arguments are not absolutely incompatible does not vitiate a choice to make one or the other."].)  Thus, defendant's claim on appeal is without merit.[7]

## DISPOSITION

The judgment is affirmed.


BLUMENFELD, J.[*]


We concur:



PERLUSS, P. J.



ZELON, J.

---

[7]     Defendant also criticizes Shook for not spending enough time with him preparing his defense.  While this may be a relevant factor in evaluating the substance of a claim, it does not by itself establish a claim.  "[A] presumption of ineffectiveness based on time records alone would fly in the face of all directives that defendant must show ineffectiveness to a demonstrable reality.  [Citation.]"  (*People v. Duncan* (1991) 53 Cal.3d 955, 967.)  As discussed, defendant has not satisfied that burden here.

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.