Filed 12/18/20  P. v. Facio CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B302239 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA119202) |
| v. | |
| CESAR EFREN FACIO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert Serna, Judge.  Affirmed.

Catherine White, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey,

Senior Assistant Attorney General, Scott A. Taryle and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

---

## INTRODUCTION

El Monte Police Department Officer Craig Montierth found appellant Cesar Efren Facio, a felon, asleep in his car at a traffic light, and arrested him for possession of a gun on his car's front passenger seat. In his initial interview with Officer Montierth, appellant implied the gun had been left behind by Maria Davila, a passenger from the night before who had exited his car while he was asleep. After being charged with unlawful possession of the gun, appellant told his appointed trial counsel he believed Davila had been responsible for the gun's presence. Over the next seven months, appellant's counsel asked him for information that would help her locate Davila, but he was unable to supply any. At the trial readiness hearing (one week before trial), appellant informed his counsel he had learned Davila was dead. He suggested his counsel investigate a defense that the gun had been planted by Officer Montierth, rather than left behind by Davila. Specifically, he suggested his counsel file a *Pitchess* motion to obtain Officer Montierth's personnel records.[1] His counsel declined.

---

[1]    *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

2

A week later, on the day set for trial, appellant made a *Marsden* motion to discharge and substitute his appointed counsel.[2] He raised several complaints about his counsel's performance, including her failure to file a *Pitchess* motion. His counsel explained she had not filed a *Pitchess* motion because she had limited her investigation to the defense suggested by appellant himself, viz., that Davila had left the gun in the car. Appellant failed to respond to his counsel's explanation, instead merely renewing an unrelated complaint. The trial court denied the *Marsden* motion. At trial, appellant's counsel argued there was reasonable doubt whether Davila was responsible for the gun's presence, emphasizing that appellant's testimony concerning Davila was consistent with his initial statement to Officer Montierth immediately after he awoke in his car. The jury convicted appellant.

On appeal, appellant contends the trial court abused its discretion by denying his *Marsden* motion. He concedes his counsel acted reasonably in the seven months between their first meeting and the trial readiness hearing, but argues the court should have recognized his counsel was unconstitutionally ineffective for failing to file a *Pitchess* motion when he suggested doing so in response to Davila's reported death. The People argue defense counsel's decision to forgo filing a *Pitchess* motion was reasonable because, inter alia, "Officer Montierth's confidential personnel records

---

[2]      *People v. Marsden* (1970) 2 Cal.3d 118.

was [*sic*] not material [to] . . . appellant's claim that Davila left the gun in the car."

Agreeing with the People, we affirm. Nothing in the record before the trial court contradicted the court's implied finding that counsel reasonably declined to file a *Pitchess* motion because Officer Montierth's personnel records were immaterial to the defense that Davila left the gun behind, which counsel reasonably selected as her trial strategy in reliance on appellant's statements. Because appellant failed to make a substantial showing that his counsel's continued representation was likely to be constitutionally inadequate, the trial court acted within its discretion in denying the *Marsden* motion.

## FACTUAL BACKGROUND
### A. *Pretrial Proceedings*

In the early morning of September 14, 2018, at a traffic light in El Monte, appellant fell asleep at the wheel of his car. He was awakened by Officer Montierth and arrested for possession of a gun on the front passenger seat. Denying that he had ever possessed or been aware of the gun, appellant told the officer that Maria Davila, whom he had met through a program of an unspecified nature, had been seated in the passenger seat when he fell asleep, implying she had left the gun behind while he was asleep. According to Officer Montierth's arrest report, the police department contacted appellant's probation officer in an unsuccessful

4

attempt to obtain information about the program through which appellant had reportedly met Davila.

On February 6, 2019, the People charged appellant with possessing a firearm as a felon (Pen. Code, § 29800, subd. (a)(1)), and alleged that he had a prior strike conviction (*id.*, §§ 667, subd. (d), 1170.12, subd. (b)).  The same day, appellant first met his trial counsel, with whom he shared his belief that Davila had left the gun in his car.  Over the next seven months, appellant's counsel asked appellant for information that would help her locate Davila, but he was unable to supply any.

On September 12, 2019 (one week before the trial date), the court held a trial readiness hearing, and the parties announced they were ready for trial.  The same day, appellant informed his counsel for the first time that he had learned -- from a previously undisclosed source -- that Davila had recently died.  Appellant then raised, for the first time, the possibility that Officer Montierth had planted the gun in his car.  Appellant suggested that his counsel seek Officer Montierth's personnel files by means of a *Pitchess* motion. She declined.

### B. Marsden *Hearing*

On September 19, 2019 (the date set for trial), appellant informed the court he wanted to discuss issues he had with his counsel, and the court held a *Marsden* hearing. When invited by the court to share his concerns, appellant responded, "That I have zero -- since the beginning of the

5

thing, of the trial, I had asked [defense counsel] can you file this motion, that motion and she didn't want to file it. I told her she can file a *Pitchess* motion on an officer and she could file a motion to suppress the evidence. If she could get the fingerprints of [*sic*] the gun that, you know, that I know the gun wasn't mine. And she didn't want to do none of that. [¶] As far as my discovery, she didn't want to give me my discovery. And, you know, I think like she had confused -- she had confused my case with another case. . . . She said there was a 911 call that was made and I said there was never a 911 call made. So I find all these things out. Since day one she told me I didn't have a chance of beating this case." When asked if he wanted his counsel to continue representing him, he said no and commented, "I know she's a good attorney but she's not helping me get like -- get what I'm asking for. [¶] . . . [¶] I told her like, you know, I know she has a lot of cases. Why can't I get the discovery and the things so I can probably help her out."

When invited by the court to respond, appellant's counsel noted she had 25 years of experience as a criminal defense lawyer (in addition to at least five years of practice experience in another field). She addressed appellant's complaint about her decision not to file a *Pitchess* motion as follows:

> "He said from the very beginning he's been telling me that I need to file a *Pitchess* motion. That is absolutely and unequivocally incorrect. [¶] [Appellant] has maintained a defense to this

6

charge that had absolutely nothing to do with the thought or the idea of a *Pitchess* motion from the very beginning of when I met him on this case. My first meeting with [appellant] was on February 6 of 2019. . . . [¶] . . . [¶] And [appellant] has began his conversation with me that [*sic*] his defense was that there was someone else in the car with him and that individual, he gave the name to me and told me that individual left the car and left the items that were found in the car when the police came there. [¶] We immediately began trying to get information from [appellant] as to where we might find that individual. He had absolutely no information whatsoever to offer. [¶] I indicated to him that in the police report, the police even contacted his probation officer to try to get information on the program that he claimed he met this individual at. They had absolutely no information on this individual. [¶] Every time he came to court, I asked him for that information. He never had it. I called him, made attempts to contact him via telephone. I did reach his mother who was Spanish-speaking to who [*sic*] took my phone number down. [Appellant] finally called me back and said, 'My mom wrote the wrong number down and I couldn't reach you.' So he's never come to court with any of the information that I've asked him for. [¶] Finally, on the date of readiness, which was . . . September 12, . . . [appellant] came to court and on that date we had

a conversation and he then said to me about the individual that we've been looking for for eight months,[3] he says, 'Oh, I found out -- I went to her sister's house and she's dead.' [¶] I said, 'You went to her sister's house? You had an address? You know where her sister lives?' Like I've been trying to get information to find this person. He said, 'Oh, no, no, I didn't know where she lived. But I even have all this other information. I have a card from her funeral.' I said, 'Well then, bring it here.' He said he left it at home. [¶] Then he says how do I know that the officer didn't put the gun in the car? I said we don't know. I said, 'Why are you saying that now? You've been saying all along who left it there.'"

Appellant's counsel proceeded to address appellant's complaints that she had not given him copies of materials produced in discovery, and that she had momentarily confused his case with another case. She then informed the court that appellant had additionally complained to her on the basis of mistaken beliefs about the law, viz., beliefs that (1) the People could not prosecute him for possession of the gun without fingerprint evidence, and (2) the court was required to dismiss his prior strike because of the strike's age. She had informed appellant that he was mistaken, but that he had the option to seek self-representation if he

---

[3] Seven months, not eight, passed between appellant's first meeting with his trial counsel in February 2019 and the September 2019 readiness and *Marsden* hearings.

8

believed he better understood the law. She noted she had negotiated "several [plea] deals," including one "which included [appellant] not admitting to any strike and receiving two years with half time." She had also unsuccessfully requested suspended time, after which appellant erroneously complained that she had not requested it. She concluded, "So [appellant]'s claims are based solely on the fact that I'm not giving him the answers that he wants. [¶] [Appellant] said that I told him that he can't beat the case. I told him, 'That's my advice as your lawyer. I tell you how I assess the case and what the evidence is against you . . . . [B]ased on all of that, I do not think that you will win this case.' . . . I still maintain that position. . . . However, I will give him a trial, and I will do my absolute best for him, as I do with every single client that I have."

When invited by the court to respond, appellant renewed his complaint that his counsel had told him "from day one" that he would lose the case. In response to an inquiry from the court, he confirmed there was nothing else he wanted to say.

The court told appellant his counsel properly had shared her honest opinion about his chance of success at trial, and properly had pointed out his mistaken beliefs about the law. The court continued:

> "And then as far as filing the motions, again, that's why you have an attorney. The attorney is the one that determines the appropriate motions

9

to file and she's entirely correct. Depending on what your defense is, I don't know what you think typically happens in cases. Attorneys are bound by ethical obligations and if there's a motion that is effectively a false motion, they can't file it. And if your defense is -- I don't need to get into the details of what it is. If your defense is a certain thing and that motion doesn't apply to it, they have an ethical obligation not to file a motion based on something that's not true. [¶] And then again, the last point I'll address is, again, it sounds like she's -- she was asking you from early on to provide whatever witness it was, whatever information you had. It doesn't sound like you're saying anything is different than what she said. She kept on asking you for address, phone numbers, whatever it is, apparently you weren't able to provide it until you told her that some person, whoever it was, was suddenly dead. So it sounds like she was asking you. You're the one who has the information. You're the one who needed to provide it."

Expressing confidence that defense counsel's representation would be adequate to ensure a fair trial, the court denied the *Marsden* motion.

### C. *Trial*

At trial, Officer Montierth testified that on September 14, 2018, around 2:45 a.m., he saw a car stopped between two lanes at a traffic light. He looked inside the car and saw appellant asleep in the driver's seat. Approaching the car,

10

he saw a gun on the front passenger seat. He determined the gun was loaded and functional. He also saw an open can of beer in the car, but he did not smell alcohol on appellant. During his initial interview of appellant, appellant claimed Davila had been a passenger in his car when he fell asleep.

Consistent with his initial statement to Officer Montierth, appellant testified that Davila had been a passenger in his car when he fell asleep.[4] When he awoke, Davila was gone. He had neither possessed the gun nor known of its presence. He had not been drinking alcohol. The parties stipulated that appellant had a prior felony conviction.

The prosecutor argued the elements of the felon-in-possession charge were satisfied by Officer Montierth's testimony and the stipulation regarding appellant's prior felony conviction. Appellant's counsel argued the

---

[4]     On cross-examination, appellant provided additional details regarding Davila's alleged presence in his car. He testified he had met Davila two months before his arrest, through weekly meetings held by a program of an unspecified nature. Around 1:30 a.m. on September 14, 2018, he completed a 10-hour shift as a forklift driver in Compton, then set out for his sister's house in Rosemead. His chosen route passed by Union Station, where he happened upon Davila, who flagged him down and requested a ride to El Monte. He agreed to give her a ride as far as his own destination, Rosemead. However, he unintentionally "passed the exit" for Rosemead and therefore ended up in El Monte. He fell asleep at the El Monte intersection where Officer Montierth found him.

prosecution had failed to prove beyond a reasonable doubt that appellant knew there was a gun in his car. She argued there was a reasonable doubt whether Davila had left the gun in the car without appellant's knowledge, relying on appellant's testimony that Davila had been present in the car and departed while he was asleep. She argued Davila's presence was corroborated by Officer Montierth's testimony that there was an open can of beer in the car, reminding the jury that appellant had denied drinking alcohol, and that the officer had acknowledged appellant did not smell of alcohol. She noted the absence of physical evidence linking appellant to the gun. She emphasized that appellant's account of Davila's presence and departure was consistent with his initial statement when woken by Officer Montierth, commenting, "[I]t usually takes me a little bit longer to conjure up a story if I'm going to make one [up] coming out of a dead sleep. . . . But he told them that night, right then and there. Nothing to suggest he lied." In rebuttal, the prosecutor challenged the credibility of appellant's account on various grounds.

The jury convicted appellant of the felon-in-possession charge, and appellant subsequently admitted the prior-strike allegation. After denying appellant's motion to dismiss the strike, the trial court sentenced appellant to a term of four years in prison (the middle term of two years, doubled under the three strikes law). Appellant timely appealed.

## DISCUSSION

Appellant contends the trial court abused its discretion by denying his *Marsden* motion.  He concedes his counsel acted reasonably in the seven months between their first meeting and the trial readiness hearing, but argues the court should have recognized his counsel was unconstitutionally ineffective for failing to file a *Pitchess* motion when he suggested doing so in response to Davila's reported death.  The People argue defense counsel's decision to forgo filing a *Pitchess* motion was reasonable because, inter alia, Officer Montierth's personnel records were immaterial to appellant's claim that Davila had left the gun in the car.

### A. *Principles*

Our review requires two levels of deference to the decisions made by both the trial court and defense counsel. First, a trial court's denial of a *Marsden* motion is reviewed for error under the "deferential" abuse of discretion standard. (*People v. Jones* (2003) 29 Cal.4th 1229, 1245.)  Second, "[i]n measuring counsel's performance, the United States Supreme Court has cautioned that judicial scrutiny 'must be highly deferential. . . .  [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."  [Citation.]  There are countless ways

to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.'" (*In re Andrews* (2002) 28 Cal.4th 1234, 1253-1254 (*Andrews*).)

A *Marsden* motion should be granted "'"if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result."'" (*People v. Streeter* (2012) 54 Cal.4th 205, 230 (*Streeter*).)  "'A defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense.  [Citation.]  Tactical disagreements between the defendant and his attorney do not by themselves constitute an "irreconcilable conflict."'" (*People v. Jackson* (2009) 45 Cal.4th 662, 688.)  "'A trial court should grant a defendant's *Marsden* motion only when the defendant has made "a substantial showing that failure to order substitution [of counsel] is likely to result in constitutionally inadequate representation."'" (*Streeter, supra*, 54 Cal.4th at 230.)

Defense counsel has a duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." (*Andrews, supra*, 28 Cal.4th at 1254.)  "'[W]hat investigation decisions are reasonable depends critically on'" information supplied by the defendant. (*In re Crew* (2011) 52 Cal.4th 126, 148.)  Counsel's performance in investigations must be measured under the deferential standards set forth above.  (See

14

*Andrews*, *supra*, 28 Cal.4th at 1254 ["'a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments'"]; *Cullen v. Pinholster* (2011) 563 U.S. 170, 197 [courts owe "'a heavy measure of deference'" to defense counsel's decisions that particular investigations are unnecessary because "another strategy is in order"]; Burkoff & Burkoff, Ineffective Assistance of Counsel (2020) Pretrial investigation or research § 6:33 ["In light of the wide range of conduct which can be defined as reasonable strategy, courts are generally reluctant to find ineffective assistance based on inadequate investigation . . . absent a complete failure of counsel to conduct pretrial preparation"].) Under those standards, "valid strategic choices are possible even without extensive investigative efforts." (*Andrews*, *supra*, 28 Cal.4th at 1254.) "Whether or not counsel could have undertaken a more thorough investigation, "'[w]e address not what is prudent or appropriate, but only what is constitutionally compelled." [Citation.]'" (*Id.* at 1261.)

### B. *Analysis*

The trial court acted within its discretion in denying appellant's *Marsden* motion, as appellant failed to make a substantial showing that his counsel's continued representation was likely to be constitutionally inadequate. Appellant's complaint that his counsel had declined to file a *Pitchess* motion did not show he and his counsel had become

embroiled in such an irreconcilable conflict that ineffective representation was likely to result.  As appellant acknowledges on appeal, "[a] defendant's complaint about counsel's failure to file a *Pitchess* motion implicates an attorney's tactical decisions."  A tactical disagreement does not constitute an irreconcilable conflict.  (*People v. Jackson*, *supra*, 45 Cal.4th at 688.)  Moreover, the court had reason to doubt the sincerity of appellant's complaint concerning a *Pitchess* motion, given that he made the complaint only on the eve of trial (over seven months after he first met his counsel), and that he failed to respond to her explanation for declining to file a *Pitchess* motion, instead merely renewing his complaint that she believed a jury would convict him. (See *People v. Whitt* (1990) 51 Cal.3d 620, 659 [defendant's delay in expressing dissatisfaction with counsel gave trial court "reasonable grounds to question the sincerity of his current criticisms"]; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1033-1034 [trial court reasonably viewed defendant's midtrial *Marsden* motion "as a last-ditch effort to delay the jury verdict, and as having little bearing on the attorney-client relationship"].)  Thus, appellant did not show the existence of any irreconcilable conflict likely to result in ineffective representation.

Nor did appellant otherwise show that his counsel's continued representation was likely to be constitutionally inadequate.  Appellant concedes his counsel acted reasonably in declining to file a *Pitchess* motion during the seven months between their first meeting and the trial

16

readiness hearing, in reliance on appellant's representations concerning Davila (whom his counsel "diligently" attempted to locate). (See *In re Crew, supra,* 52 Cal.4th at 148 [reasonableness of defense counsel's investigation decisions depends critically on information supplied by defendant].) We reject appellant's contention that his report of Davila's death, made one week before trial, was such a dramatic change in circumstances as to transform a previously reasonable strategy into a violation of professional norms. Though appellant argues his report left his counsel with only an "uncorroborated" defense theory, his counsel properly emphasized at trial that his testimony concerning Davila was corroborated by his identical statement to Officer Montierth immediately after he awoke in his car.[5] "Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." (*Harrington v. Richter* (2011) 562 U.S. 86, 107.) The trial court reasonably concluded appellant's counsel did just that.

Appellant fails to cite any case finding an abuse of discretion in the denial of a *Marsden* motion premised on counsel's allegedly inadequate investigation. Though he cites non-*Marsden* cases finding inadequate investigation,

---

[5] Appellant's counsel additionally urged the jury to find appellant's testimony credible on the ground that Davila must have been responsible for the open can of beer in the car, as appellant denied drinking and Officer Montierth acknowledged appellant did not smell of alcohol.

the courts in those cases faulted defense attorneys for failing to act on information in their possession from which they should have expected further investigation to yield useful evidence. (See *In re Thomas* (2006) 37 Cal.4th 1249, 1262-1263 [defense counsel mounted defense that defendant's alleged victims were killed by third party, based on testimony of single witness found in one community, but failed to search second community for corroborating witnesses, despite knowing or having strong reason to suspect victims and their alleged killer belonged to second community]; *In re Lucas* (2004) 33 Cal.4th 682, 730-731 [defense counsel failed to investigate defendant's social history, despite possessing information suggesting such investigation could produce evidence "strongly supportive of both" counsel's chosen mitigation strategy (stressing defendant's drug dependency at time of crimes) and potentially complementary strategy (stressing defendant's abusive childhood)]; *Wiggins v. Smith* (2003) 539 U.S. 510, 525-526 [social service records in defense counsel's possession disclosed leads for investigation into mitigating evidence of defendant's personal history, but counsel failed to pursue those leads]; *People v. Mozingo* (1983) 34 Cal.3d 926, 932 [file in defense counsel's possession contained "'significant material which would alert a reasonably competent attorney to investigate possible mental defenses,'" but counsel "'paid little attention'" to file and declined to investigate such defenses].) Here, no evidence in the trial court record should have led appellant's counsel to expect

that an investigation into Officer Montierth's personnel files would bear fruit.[6]

On this record, we conclude appellant's counsel permissibly decided to forego a motion seeking Officer Montierth's personnel files in light of her continued pursuit of a defense to which the personnel files were immaterial -- a defense that appellant had suggested in his statements to counsel, and that was corroborated by his initial statement to the officer. "Whether or not counsel could have undertaken a more thorough investigation," the trial court was required to "'address not what [was] prudent or appropriate, but only what [was] constitutionally compelled.'"" (*Andrews*, *supra*, 28 Cal.4th at 1261.) In making his eve-of-trial complaint about his counsel's decision, and failing to respond to her explanation for it, appellant failed to make a substantial showing that his counsel's continued representation was likely to be constitutionally inadequate. Accordingly, the trial court acted within its discretion in denying appellant's *Marsden* motion. (*Streeter*, *supra*, 54 Cal.4th at 230.)

---

[6] Appellant acknowledges that even had his counsel filed a *Pitchess* motion and the trial court found the motion meritorious, the court might have "determined there was no discoverable information" or ordered disclosure only of information leading to no admissible evidence. He identifies no evidence that should have led his counsel to expect a more useful result, regardless of the merits of the motion. We therefore decline to resolve the parties' dispute whether his counsel reasonably could have believed a *Pitchess* motion would have lacked merit.

19

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, P. J.


We concur:


WILLHITE, J.


CURREY, J.

20